## STATE v. JOHN MATTHEWS.

### (Filed 5 March, 1913.)

**1. Homicide — Murder — Circumstantial Evidence — Questions for Jury.**

Where upon a trial for murder circumstantial evidence for a conviction is relied on, and the circumstances tend to show defendant's guilt, so that the deduction of guilt from the circumstances is not merely conjectural or probable, they should be submitted to the jury, for they are the judges of the force or weight of the evidence of the defendant's guilt.

**2. Homicide—Murder—Circumstantial Evidence—Close Scrutiny—Instructions.**

Where circumstantial evidence is relied on for a conviction of a criminal offense, the court should warn the jury that the evidence, from its character, should be closely and cautiously scanned by them before rendering a verdict of the defendant's guilt.

3. Homicide — Murder—Circumstantial. Evidence—Motive—Instruc-
   tions for Jury.

   Upon a trial for murder, the evidence in this case of improper
   relations between the prisoner and the wife of deceased as to
   motive; threats made by the prisoner on the life of the deceased,
   one of which, that he would kill the deceased on a day certain,
   appeared to have been carried out by the murder of deceased
   on the day named; threats against deceased's wife should she
   disclose communications of this nature he had made to her; his
   unwillingness for deceased to visit his own wife, who was living
   on land the prisoner claimed to have rented; the finding of the
   body of the deceased at his own home with a gun-shot wound
   in his head, while his gun remained on a rack in the room, the
   circumstances tending to show that prisoner was in a position
   to have inflicted it, when made, with other circumstances tending
   to show the prisoner's guilt, is sufficient to be submitted to the
   jury, and for them to find thereon that the defendant was
   guilty.

APPEAL by defendant from *Cline, J.*, at January Term, 1913,
of FRANKLIN.

The prisoner was indicted for the murder of one Will Clif-
ton, and convicted of murder in the second degree. From the
judgment rendered, he appealed.

The only question presented by the appeal is as to the legal
sufficiency of the evidence. This question was presented by a
prayer for instruction that, upon the whole evidence, it is the
duty of the jury to render a verdict of not guilty. The evi-
dence for the State tended to show that the home of the de-
ceased, and his wife, Clarinda Clifton, was in Franklin County,
and that a short time before the homicide the deceased Clifton
had been working near Spring Hope, in Nash County, and on
the Sunday before, the deceased returned home. On the morn-
ing of the homicide the deceased, his wife, and the defendant
were at the house of a neighbor, about one-half of a mile away,
and after Clifton and his wife left for their house, the defend-
ant was seen going in that direction. The deceased left his
house with his gun about 11 o'clock, and some time between 11
and 12 o'clock a shot was heard in the locality in which his
body was afterwards found, near his home. About 20 minutes
after the shot was heard, the defendant was seen about three-

quarters of a mile from the house of the deceased. The evidence for the State further tended to show that, in the absence of the deceased, the defendant had been in the habit of visiting the wife of the deceased. This was admitted by Clarinda Clifton in her testimony as a State's witness.

Richard Alston testified: "I knew Will Clifton. He is dead. Clarinda Clifton was his wife. They lived at the same house in October last. I lived one-half mile away. They lived off the Halifax Road and·public path from Gold Mine Road to Mr. Wood's store. I remember the Sunday Clifton was killed. He, his wife, and defendant were at my house about two hours by sun. Just came there. Stayed 15 or 20 minutes after I got there. I sent a man a gallon of wine by defendant; he was in a buggy. Clifton and wife were walking. Defendant left my house first, about 8 or 9 o'clock. Defendant went towards Clifton's house. I heard no conversation between them. Will Clifton left my house sober. I saw defendant again that evening, about half an hour or an hour by sun, near my garden; he was on his way home; his horse walking along. Defendant lived two miles from Will Clifton's. In the afternoon he came from the same direction he went in the morning. I live nearest to the Cliftons. I went to their house that night. Will Clifton was dead; lying on face and wound on back of his head. I could have put my fist in it. Clifton had been down about Spring Hope. He went away in January, and I had not seen him since. Will Clifton and wife left my house about 9 or 10 o'clock that morning. When defendant left my house he took a road away from the Cliftons' house; at least, he did so far as I saw him."

Clarinda Clifton testified: That on the Sunday before her husband came home, the defendant came to her house, and one William Alston came after him, and that the defendant said to Alston: "Hell is·going to be to pay here. Ed Taylor and Ellerson Jefferson had gone to Spring Hope to get Will to come home. He phoned to Penny Mitchell yesterday that he was coming, and I came here last night and lay in the bushes until 2 o'clock with a double-barrel gun to kill him if he did come." She further testified that, "On Thursday before Will was killed

on Sunday, the second Sunday in October, the defendant came
to the field where I was picking cotton, with his gun in his
arms, and said, 'Will did not have any right there.' I said,
'Will says he has a right wheresoever I am.' · He said, 'Well,
N. C. Gupton says he's not got any right here, and he shan't
stay. He may live to see the sun rise the third day, but he will
never see it rise and set the fourth day.' We went on out to
the end of the row, and he said: 'You may have to tell some-
thing—they may make you tell something. Don't you call my
name; you put it on some one else. I don't want to kill you,
but I will do it. I started to kill you once the year you stayed
at Rufus Kearney's, but didn't.' I did not see defendant any
more until that Sunday morning, the second Sunday in Octo-
ber, between 8 and 9 o'clock. Will and I went up to Richard
Alston's; he and Richard were standing at the back of the
house. Had horse hitched to the buggy, and jug in buggy. I
went to the kitchen then, and saw him at the door drinking
water. Did not see him any more until Monday night. My
husband went over to camp. Came back, and he and I went
home. This was about 11 A. M. Carried my little child with
me. Will went into the house, got his coat and got his gun.
Went out the path towards the Shocco Road. That was be-
tween 11 and 12 o'clock, and I never saw him alive again. I
went over to Albert Alston's, and when I got back between 5
and 6 o'clock in the evening—me and the four children—Will
was lying on the floor dead. He had his feet towards back of
house; head towards fireplace; sort of between the beds, lying
on face; arms rather under him. Saw blood only where he was
lying. He lay on two quilts and a pillow. I tried to give
alarm. Sent two little boys after Mr. Manning. He came.
They reported it to the coroner. He came Monday morning.
On the first day of the preceding January Will had gone to
Spring Hope. Defendant visited me. He was there sometimes
every day. Had 4 acres in cotton near there. I heard a gun
about 4 o'clock that Sunday evening in the direction of that
house. Albert Alston and his wife also heard it. I said, 'There
is some one shooting.' She said, 'Some one is always shooting.

They don't regard Sunday.' When I got back, Will's gun was in the rack, and his coat hanging up. He was in his shirt sleeves. On the day of the inquest, he (defendant) said to me, 'Mrs. Clifton, they is trying to put this murder case on me, and if you tells anything that I have said, I am going to do everything I can against you, to send you to Raleigh; and if you and I ever hits the ground together, there will be another day of it.' He went down the road and spoke to Sarah Alston. I was married to Will twelve years. Have six children. I am 34 years old. I was at Warrenton the second Sunday in October. Went with Albert Alston in his buggy. Left about 8 that morning. Got home an hour and a half by sun. I had not grown tired of Will. Did not offer $100 to have him killed. I was in jail a while after coroner's inquest. Albert Alston had been there in daytime and also at night. I had rented an ox from him. Yes, I said the gun fired in the direction of our house. Albert Alston never knew me but once in his life. That was about four weeks before Will came home. John Matthews came there often. No other men came there. I did not handle my husband's gun, but it was loaded. When I got there my husband's feet were cold, but he was not stiff."

A witness by the name of Van Burt testified: "I live in that section of the country. I know the defendant. He passed my house on Saturday before, about 1 o'clock. He asked me if I had seen Bill. I told him I had seen him one time. He said, 'What did he say?' I told him Bill said he had come home now, and was going to stay. Defendant said, 'Well, if he has come home, he is not going to rule that plantation this year. I rented it, and am going to rule it.' On Sunday, about 11 o'clock, I heard a gun fire right in direction of Bill's house. When I was called to Bill's house that night, he was dead. No. 4 shot killed him. Did not hear a gun shoot that afternoon. I live one mile or one mile and a half from there."

Ed. Alston testified: "I recollect the day of the killing. My wife and I were going down to my sister's marriage, between 10 and 11 o'clock, near Charles Alston's old storehouse. We heard a gun fire in the direction of Clarinda Clifton's house. I drove on and came to railroad crossing three-fourths of a mile

further on.  Defendant was coming down the railroad.  He spoke to me, and said: 'I am on a trade for a dog, and on my way down to Newsom's.'  He was in a buggy by himself. It was about twenty minutes after the gun fired when I saw the defendant.  The place was about three-fourths of a mile from Clarinda's."

Ed. Taylor testified: "Live in Gold Mine Township.  Knew Will Clifton.  He lived last year in Spring Hope.  Saw him there.  He came home 23 September, 1912.  I went to Clarinda's house 6 August, 1912, in company with Penny Mitchell. About three days later I had a consultation with the defendant in the road in front of my door.  He said to me, 'I suppose you went down to see Clarinda.'  I said, 'Yes.'  He asked me who went with me.  I told him Penny Mitchell.  He asked me, 'What did she say to Clarinda?'  I told him that she told Clarinda she wanted to bring her up to the house to care for her while she was sick.  He said, 'Well, she and no one else is going to bring her away from down there.'  This was about 29 August, 1912."

This closed the testimony.  The court refused the instruction requested by the prisoner as to the sufficiency of the evidence, to which he excepted.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*W. M. Person for defendant.*

WALKER, J., after stating the case: We are again called upon to decide what is often a very perplexing question, whether there is any evidence for submission to the jury.  It is not apt to be a difficult one when the evidence is direct, and especially when it is credible, for belief in that case is generally the immediate and necessary result; whereas, in cases of circumstantial evidence, processes of inference and deduction are essentially involved, frequently of a most delicate and embarrassing character, liable to numerous causes of fallacy, some of them inherent in the nature of the mind itself, "which has been profoundly compared to the disturbing power of an uneven mirror, imparting its own nature upon the true nature of things."  Wills on

Circumstantial Evidence, p. 33.   So that *Baron Alderson* said in *Reg. v. Hodges,* 2 Lewis Cr. Cases, 227, "it was necessary to warn the jury against the danger of being misled by a train of circumstantial evidence.   The mind was apt to take pleasure in adapting circumstances to one another, and even in straining them a little, if need be, to force them to form parts of one connected whole; and the more ingenious the mind of the individual, the more likely was it, in considering such matters, to overreach and mislead itself, to supply some little link that is wanting, to take for granted some fact consistent with its previous theories and necessary to render them complete."   It has been concluded, therefore, that such evidence should always be closely and cautiously scanned.   We cannot expect to introduce mathematical precision into our reasonings and judgments, and consequently not into our deductions, and therefore the law regards it as sufficient if guilt is established to the exclusion of every reasonable doubt, or, as it is sometimes put, of every reasonable theory or hypothesis of innocence.   If the facts and circumstances tend to show the prisoner's guilt, so that the deduction of it from them is not merely conjectural or probable, but a fairly logical and legitimate one, we cannot say that there is no evidence, but should submit the case to the jury to find whether, by them, they are convinced of the fact of guilt beyond any reasonable doubt, they being the judges of the force or weight of the evidence.   *S. v. Vaughan,* 129 N. C., 502.   The rule is well settled that if there be absolutely no evidence, or if the evidence be so slight as not reasonably to warrant the inference of the fact in issue, or if it does not furnish more than material for a mere conjecture, or merely shows it possible for the fact to be as alleged, the court will not leave it to the jury for them to find the fact.   This was held in *S. v. Vinson,* 63 N. C., 335; *S. v. Rhodes,* 111 N. C., 647; *Brown v. Kinsey,* 81 N. C., 245, and in the numerous cases cited in *Byrd v. Express Co.,* 139 N. C., 273, where the subject was fully discussed.

After a careful analysis of the testimony, we have reached the conclusion that the judge did not err in submitting it to the jury.   The circumstances pointed with convincing force to the prisoner as the perpetrator of the crime.   It was admitted that

a homicide had been committed, and there was evidence from
which the jury might well have found that the deceased could
not have killed himself. When found, his body was lying out-
stretched upon the floor, with an ugly and a mortal gun-shot
wound in the head, and his gun was in the rack. There was
no evidence connecting any one but the prisoner with the firing
of the fatal shot. Shortly after the report of the gun was heard,
he was seen riding from the direction of the house, and about
as far from there as the distance that would be traversed in the
time which had elapsed since the report of the gun was heard.
It was shown that he was evidently angry with the deceased,
and intended to take his life. He had made different threats
that he would kill him, and actually named the day on which
it would be done, and it happened just as he had foretold it.
On the Thursday before the day of the homicide, he said, "He
may live to see the sun rise the third day, but will never see it
rise and set the fourth day," and his menacing words were veri-
fied with fatal accuracy. But this is not all, nor even the half
of it. Just after he had uttered this threat to the wife of the
deceased, on Thursday, in the cotton field, they walked to the
end of the row where she had been picking cotton, and he
warned her not to call his name if they made her tell anything
about what he had said or done, and threatened, if she impli-
cated him in the homicide, that he would kill her, and advised
her to charge some one else with it. He also stated in her hear-
ing, and at her house, to Will Alston, when he heard that Will
Clifton, the deceased, was coming home, that "hell would be to
pay there." He added that two men had gone to Spring Hope
to bring Will home, and Will had telephoned that he was com-
ing, and that he had gone to Will's place and laid in the bushes
until 2 o'clock with a double-barrel gun to kill him if he did
come. On the day of the inquest, the prisoner also told the
witness Clarinda Clifton, widow of the deceased, that they were
trying "to put this murder case on him," and if she told on
him, he would do everything against her to send her to Raleigh;
meaning the penitentiary, and that if "they ever hit the ground
together, there would be another day of it." The jury might
reasonably have found that he meant by this language to admit

---

S. *v.* FISHER.

---

the killing, and that there would be another homicide if she told what he had said to her. There was also proven a strong motive for the killing, as the evidence shows that the prisoner was the paramour of deceased's wife, and not only that, but he denied the right of the deceased to occupy the land on which was his home, and was angry about it.

It would be useless to examine the evidence further in detail. Our conclusion is that it was sufficient in probative force for the jury to find, if they saw fit to do so, that the prisoner was guilty, and it is quite as strong as that which was submitted to the jury in *S. v. Wilcox,* 132 N. C., 1120, with the approval of this Court, and we may add that, in our opinion, it is of a much more convincing nature. The cases of *S. v. Brackville,* 106 N. C., 701; *S. v. Rhodes,* 111 N. C., 647, and *S. v. Goodson,* 107 N. C., 798, are distinguishable, as the decisions in them were based upon facts essentially different from those in this record. There are facts in this record which were not in those cases, and which the Court regarded as missing links necessary to forge a complete chain of circumstances, and emphasized the lack of them as being fatal to the successful prosecution of the case.

No error.