STATE v. WALL C. EWING.

(Filed 5 June, 1947.)

**1. Criminal Law § 52a—**

On motion to nonsuit only the evidence favorable to the State will be considered.

**2. Criminal Law § 28—**

In order to sustain conviction, circumstantial evidence, in the same manner as direct proof, must be sufficient to convince the jury of the fact of guilt beyond a reasonable doubt, and statements that circumstantial evidence must "exclude a rational doubt" or "exclude every rational hypothesis of innocence" are merely converse statements of the general rule as to the *quantum* of proof required, and do not impose upon the State, when relying upon circumstantial evidence, any greater intensity of proof.

**3. Criminal Law § 52a—**

Circumstantial evidence which raises a reasonable inference of defendant's guilt is sufficient to be submitted to the jury, it being for the jury to say whether it convinces them of the fact of guilt beyond a reasonable doubt.

**4. Homicide § 25—Evidence held sufficient to be submitted to the jury and to sustain conviction of manslaughter.**

The evidence tended to show that over a period of years defendant habitually and repeatedly threatened, cursed and brutally assaulted his wife, and on occasions threw her bodily to the ground, and that defendant was alone with her when she was found on the floor of her bedroom in an unconscious condition suffering from many contusions and bruises. There was expert opinion evidence that she died as a result of hemorrhage from a blow on the head. There was testimony that this injury might have resulted from a fall. *Held:* The evidence was sufficient to overrule defendant's motion to nonsuit and to sustain his conviction of manslaughter.

DEFENDANT's appeal from *Parker, J.,* at August-September Term, 1946, of CUMBERLAND.

STATE *v.* EWING.

The defendant was tried upon an indictment charging him with the murder of his wife, Douglas Southerland Ewing. The verdict was, "Guilty of manslaughter," and the judgment imprisonment in the State's Prison for not less than 18 nor more than 20 years, to be worked upon the public roads.

Since the only question presented on appeal is whether any reasonable inferences of defendant's guilt could be drawn from the facts in evidence, these are summarized as testified to by the witnesses. About 60 witnesses testified for the State and an equal number for the defendant. Only the more pertinent facts are here related.

Evidence for the defendant was mainly directed toward his condition of confirmed inebriety as bearing on his responsibility for crime, or the degrees thereof. Evidence for the State was directed toward the facts tending to establish the crime and defendant's connection with it.

A large number of the State's witnesses were close neighbors of Wall Ewing and his wife, Douglas Southerland Ewing, in the City of Fayetteville and gave eyewitness testimony about occurrences in and about the Ewing home for a period from two and one-half to three years prior to the death of Mrs. Ewing. The defendant is described as a man of from 235 to 250 pounds weight and his wife as a woman of 97 to 103 pounds. The evidence discloses that during all this time the defendant maltreated his wife, with mental torture, obscene revilings, and continual beatings and threats to kill. These increased in severity and brutality until near the time of her death, which occurred Wednesday, 13 March, 1946, about one o'clock a.m., in a hospital to which she had been carried after being found lying unconscious on the floor of her bedroom alone with the defendant, and covered with bruises.

On the preceding evening a call came to Miss Kate Southerland, a sister of Mrs. Ewing, to come to the latter's home. The evidence does not disclose the nature of the call or who made it. Miss Southerland, accompanied by a maid, went to the home of defendant's mother, living in Fayetteville, and with her, repaired to the house. The situation there was described by the maid.

Mrs. Douglas Ewing was lying upon the floor of the bedroom unconscious. There was a large bruise behind her left ear, a cut across her forehead, and other bruises upon her arms, shoulders and body. The defendant, the only other occupant of the room, was sleeping in a chair. Miss Southerland and the maid picked up Mrs. Douglas Ewing and placed her on the bed, then left. Ewing awoke before they left.

Soon, Dr. Gainey arrived, who stated on the trial he had been called by Ewing. He stated that he found Mrs. Ewing in an unconscious condition, saw many bruises,—a dozen or more separate bruises—on her shoulders and arms, legs and thighs, one across the forehead and another behind her left ear. She was carried to the hospital.

The nurse in charge testified that Mrs. Ewing had many bruises on her body besides those on the head, some old and some comparatively new. Both thighs were burned in places six to eight inches long. "Part of the burn was in a clear blister which was about two and one-half inches, the wide part of it, in a clear blister and part where the skin was burned off of either thigh."

The defendant came to the hospital, "under the influence of something"; was very boisterous. He spent most of the time in the room with Mrs. Ewing and was occasionally profane. Several times he went to the bed where the unconscious woman lay, slapped her roughly on the side of the face, exclaimed, "Snap out of it, you have been like this before. Snap out of it." This was accompanied with profanity.

While there the defendant told one of the nurses that Mrs. Ewing could have been hurt in an automobile accident "and scrambled through her hair." This was about ten minutes after her death. The nurse replied, "If she was in an automobile accident and got hurt like that it is a wonder you did not get killed," and defendant replied, "Hell, I did get hurt on my legs." But the nurse saw no sign of injury.

Defendant also told another nurse his wife had been hurt in an auto accident which bruised him "just as bad as she was," but during the time defendant was in the hospital he removed his pants and there were no bruises.

Before Mrs. Ewing died the defendant said to another nurse, "Ray, I like to have got her this time," or "I am afraid I got her this time."

The autopsy was performed by Dr. Richard H. Follis. He found that death had been caused by external force, applied behind the left ear, which disrupted the brain tissue and produced an extensive hemorrhage and blood clot, with consequent pressure and deformation of the lobes of the brain. On cross-examination he said it was the same type of force that came from a fall. Dr. Follis stated there were at least thirty bruises upon the woman's body, inflicted while she was alive.

The evidence leading up to this final stage is from testimony of near neighbors who were witnesses to occurrences in and about the Ewing home indicating the continual cruelty of the defendant to his wife, and amorous scenes between defendant and Miss Southerland, the wife's sister, some of the evidence indicating immoral relations between the two.

One witness testified that he had seen Mrs. Ewing creeping around the bushes at their home, hiding from her husband; had heard her screaming, "Wall, don't hit me any more. You are killing me," not once, but a number of times, daytime and nighttime.

Another testified that Mrs. Ewing took refuge in her house, her hair "messed up," had a black eye, was bruised and nervous. Once again she came but was not admitted—was "battered up" again.

Another testified to seeing Ewing striking his wife. Another time they were standing on the porch, and he called her "you God damn s.o.b.," and knocked her off the steps. This witness testified she could hear Mrs. Ewing screaming at night and begging defendant not to hit her any more.

A witness testified he had seen Ewing and Miss Southerland "sliding" in the backyard, and when Mrs. Ewing came out defendant told her to go back in the house. Some time afterward she saw Miss Southerland in Ewing's lap. Defendant had his arm around her and they were kissing. Mrs. Ewing came out and defendant told her to "get the hell back into the house." Another witness heard Mrs. Ewing begging Miss Southerland to leave, saying that she was lying in bed with Wall and breaking up her home.

Another witness, a member of an orchestra playing at the radio station owned or managed by defendant, gave testimony tending to show immoral relations between Ewing and Miss Southerland in the Ewing office.

At one time, testified another witness, she heard Mrs. Ewing begging defendant not to beat her, not to kill her. Mrs. Ewing came to witness' home several times. On one occasion she looked like she had been strapped with something. Witness heard her "hollering" night and day, at intervals of two or three days.

A witness testified that he had seen Mrs. Ewing running from her husband any number of times. At times defendant came out looking for her, using such expressions as "if you don't come back here you G—d— s.o.b., I am going to kill you." He had seen Ewing knock her out of the door and "run her through the neighborhood." He had seen defendant take his wife's head and beat it against the wall, with severe force.

Other witnesses testified to similar occurrences. The evidence disclosed that he had chased her with a shotgun, making continual threats to kill her, that she'd been seen disheveled and bloody after his assaults, and that on one occasion she was so bloody that the blood dripped down to the sidewalk.

A witness testified that he saw Ewing pick up his wife "like a sack" and throw her bodily out of the back door some five feet to the ground, saying, "You stay out there, you s.o.b., I've got no use for you anyway." He had seen the defendant assaulting her, slapping her, pulling her hair, "stomping" her.

On the Sunday preceding the death a witness living near heard Mrs. Ewing pleading with her husband, "Wall, please leave me alone, don't hit me any more, you have about beat me to death now." The defendant said, "You G—d— s.o.b." This same witness heard Mr. Ewing say, on Tuesday evening, about an hour before the ambulance came to take Mrs. Ewing to the hospital, "Get up off this floor, you G—d— s.o.b."

The State introduced evidence of blood on chairs and on the doors of the closet to the bedroom.

Miss Southerland was not present at the trial and her maid testified that she did not know where Miss Southerland was.

This brings the evidence for the State up to the immediate situation at the time of the death, above outlined, in the order of its introduction.

The defendant introduced evidence tending to show that, on account of continued inebriety, a mental condition had supervened, rendering defendant irresponsible for crime, especially with respect to deliberation. The State offered evidence to the contrary.

The defendant, in the manner directed by statute, demurred to the evidence and moved for judgment as of nonsuit. The motion was declined. The jury returned as its verdict, "Guilty of manslaughter." From the ensuing judgment defendant appealed, assigning as error the refusal to grant his motion of nonsuit.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*James R. Nance and McLean & Stacy for defendant, appellant.*

SEAWELL, J. Probably not wishing to risk the result of a new trial, the appellant contents himself with a demurrer to the evidence. A successful issue on that question would be equivalent to acquittal.

In the argument and in the brief, counsel for the appellant point out that the evidence is circumstantial, present the usual arguments against the conclusiveness of evidence of that character, with new angles, it is thought, applicable to the facts of the case. It is contended that the facts presented in evidence do not unerringly point to the *corpus delicti,* nor to the defendant as the guilty person, but leave it to surmise whether the deceased woman came to her death by foul means or by accident, without any criminal contribution by the husband. Stress is put on the statement of Dr. Follis, a State's witness, made on cross-examination, that the external force which inflicted the death injury was "the same type of force that comes from a fall"; and the testimony of Dr. Turner, a witness for the defendant, in answer to a hypothetical question, that the *contre coup* which disrupted the brain tissue on the opposite side of the blow and caused the hemorrhage, in his opinion indicated that deceased was moving at the time she sustained the injury. It is a rule, based upon the nature of demurrer, that in considering its sufficiency we regard only that evidence which is favorable to the State. Passing that, however, we are of opinion that the injection of this theory into the evidence did not leave the question of the cause of the injury as nicely balanced as the defense might desire.

We do not look on the case at bar as affording an occasion for an extended review of cases here, or elsewhere, involving the use of circumstantial evidence as an instrument in the proof of crime.

While, from the very nature of the evidence, no two cases can be found identical in fact pattern, we suggest reference to *S. v. Wilcox,* 132 N. C., 1120, 44 S. E., 625; *S. v. Harrison,* 145 N. C., 408, 59 S. E., 867; *S. v. Lawrence,* 196 N. C., 562, 146 S. E., 395,—each a *cause celebre* in our legal history,—in which may be found, we think, an answer to the challenge of uncertainty now made and usually made against this type of evidence, and an explanation of expressions intended to be helpful in its analysis and consideration. To these may be added *S. v. Brackville,* 106 N. C., 701, 11 S. E., 517; *S. v. Melton,* 187 N. C., 481, 483, 122 S. E., 17; and many other cases of similar import. It was not the purpose of these cases in any of their expressions to alter or affect the existing rule as to the intensity of proof required to convict. *S. v. Shook,* 224 N. C., 728, 32 S. E. (2d), 329; *S. v. Crane,* 110 N. C., 530, 15 S. E., 231; *S. v. Flemming,* 130 N. C., 688, 41 S. E., 549; *S. v. Wilcox, supra; S. v. Adams,* 138 N. C., 688, 50 S. E., 765; *S. v. Willoughby,* 180 N. C., 676, 103 S. E., 903. That rule is, and has been from time almost immemorial, that to justify the conviction the jury must be convinced beyond a reasonable doubt of the guilt of the accused, and it applies no matter what mode of proof is involved. The angle of approach and review of circumstantial evidence is necessarily somewhat different. Nevertheless, statements to the effect that the evidence should "exclude a rational doubt as to the prisoner's guilt" (*S. v. Wilcox, supra*), or "exclude every rational hypothesis of innocence" (*S. v. Melton, supra; S. v. Matthews,* 162 N. C., 542, 548, 77 S. E., 302; *S. v. Newton,* 207 N. C., 323, 327, 177 N. C., 184; *S. v. Stiwinter,* 211 N. C., 278, 279, 189 S. E., 868) are simply converse statements of the rule of reasonable doubt, universally applied, and do not handicap circumstantial evidence as an instrument of proof with the necessity of doing more. When reasonable inferences may be drawn from them, pointing to defendant's guilt, it is a matter for the jury to decide whether the facts taken singly or in combination produce in their minds the requisite moral conviction beyond a reasonable doubt. *S. v. Matthews, supra; S. v. Gardner,* 226 N. C., 310, 311.

The same evidence that pointed to the guilt of the defendant was ample to establish the *corpus delicti.* It disclosed motive, often expressed intent, a hatred and brutality hardly equaled in the annals of this Court, and as far as the evidence goes, exclusive opportunity. Defendant's statement at the hospital in the presence of the dying woman, "Ray, I am afraid I got her this time," is a *multum in parvo* expression significant as to past occurrences and the present authorship of her lethal injury.

It is the duty of the Court to analyze and apply the evidence in the cold light of reason and logic untouched by any resentment to which our common humanity is subject. Looking at the evidence as impersonally and objectively as the duty demands, we find it ample to sustain the conviction. Appellant no doubt has cause to thank the able defense of his counsel and the mercy of the jury that his present plight is no worse. The demurrer to the evidence was properly overruled. We find

No error.