STATE v. W. H. LAWRENCE.

(Filed 23 January, 1929.)

**1. Criminal Law—Trial—Nonsuit—Evidence.**

Upon appeal from the denial of a motion as of nonsuit in a criminal action, review of the evidence is not confined to the State's evidence alone, but all the evidence in the State's favor, taken in the light most favorable to the State and giving it every reasonable intendment there-

from, will be considered, and where there is sufficient evidence of the defendant's guilt upon the whole record, the action of the trial judge in denying the motion of nonsuit will be upheld. C. S., 4643.

**2. Same—Province of Court and Jury In General.**

The competency, admissibility and sufficiency of evidence is for the court to determine; the weight, effect and credibility is for the jury.

**3. Criminal Law—Evidence—Circumstantial Evidence.**

Circumstantial evidence sufficient for conviction should be clear, convincing and conclusive, showing facts, relations, connections and combinations between the circumstances that are natural, clear, reasonable and satisfactory, excluding all reasonable doubt of guilt and every reasonable conclusion of innocence.

**4. Same—Evidence of Identification.**

Testimony that a person who looked like the defendant was seen in the vicinity of the crime is competent and admissible to establish the identity of the defendant when taken in connection with other evidence of guilt.

**5. Criminal Law—Evidence—Attempted Suicide as Evidence of Guilt.**

Evidence of an attempt by the defendant to commit suicide while on trial for murder is competent, taken in connection with other circumstances, to be considered by the jury upon the question of defendant's guilt.

**6. Homicide—Evidence—Weight and Sufficiency—Nonsuit.**

Evidence tending to show that the deceased was struck about the head with a weapon and thrown into a river, that the defendant had a motive for the crime, and that his automobile had blood spots on it at a place where a passenger therein bleeding from the head would leave blood spots, with evidence that an automobile similar to that of the defendant in which was a man who looked like the defendant was seen on the bridge from which the crime was committed and in the vicinity of the crime at about the time of its commission, that the automobile seen on the bridge made tracks at either end similar to the tread of the tires on the defendant's car, that when the defendant was asked about the crime he was nervous and made contradictory statements as to his knowledge of and relations with the deceased; that during the trial the defendant attempted suicide, together with other evidence of motive and identity: *Held,* the circumstantial evidence of defendant's guilt was sufficient to be submitted to the jury and to sustain their verdict thereon of murder in the second degree.

BROGDEN, J., dissenting.

APPEAL by defendant from *Nunn, J.,* and a jury, at May Term, 1928, of CHATHAM. No error.

This defendant was indicted for murder in the first degree of Mrs. Annie Terry. He was convicted of murder in the second degree. The judgment of the court below was that the defendant be confined in the State's prison for a term of thirty years. The material evidence will be considered in the opinion.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Fuller, Reade & Fuller, Long & Bell, Pou & Pou and J. L. Emanuel for defendant.*

CLARKSON, J. The defendant, at the close of the State's evidence and at the close of all the evidence, moved to dismiss the action or for judgment of nonsuit. C. S., 4643. The court below denied the motions. This constitutes defendant's sole exceptions and assignments of error. The only question involved in this appeal: Was there sufficient evidence of defendant's guilt to be submitted to the jury? We think so.

On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. "An exception to a motion to dismiss in a criminal action taken after the close of the State's evidence, and renewed by defendant after the introduction of his own evidence does not confine the appeal to the State's evidence alone, and a conviction will be sustained under the second exception if there is any evidence on the whole record of the defendant's guilt." *S. v. Earp, ante,* at p. 166. See *S. v. Carlson,* 171 N. C., 818; *S. v. Sigmon,* 190 N. C., 684. The evidence favorable alone to the State is considered— defendant's evidence is discarded. *S. v. Utley,* 126 N. C., 997. The competency, admissibility and sufficiency of evidence is for the court to determine, the weight, effect and credibility is for the jury. *S. v. Utley, supra; S. v. Blackwelder,* 182 N. C., 899. The evidence in the case was circumstantial.

In *S. v. Plyler,* 153 N. C., at p. 636, this Court approved the charge of the court below, which was as follows: "The law says that circumstantial evidence is a recognized and accepted instrumentality in the ascertainment of truth; and it is essential and when properly understood and applied is highly satisfactory in matters of the gravest moment. The facts, relations, connections and combinations between the circumstances should be natural, clear, reasonable and satisfactory. When such evidence is relied upon to convict, it should be clear, convincing and conclusive in all its combinations and should exclude all reasonable doubt as to guilt. In passing upon such evidence, it is the duty of the jury to consider all circumstances relied upon to convict and to determine whether they have been established beyond a reasonable doubt. If not so established, the circumstances should be excluded from further consideration and have no weight in reaching a verdict. The State puts up a witness here and undertakes to prove a circumstance; you will first determine in your mind, is this circumstance established beyond a

reasonable doubt? If you say that circumstance has been established beyond a reasonable doubt, you take that into consideration in determining what verdict you will find. After considering the evidence in this way, and determining the circumstances which are established beyond a reasonable doubt, the next thing for the jury to determine is, do these circumstances exclude every other reasonable conclusion except that of guilt? If so, the evidence is sufficient to convict; otherwise, not."

This Court, in approving the above charge, which was made by Judge Wm. R. Allen in the court below, afterwards a member of this Court, made this observation: "Give it our approval as a lucid statement of the law." *S. v. Brackville,* 106 N. C., 701 (710); *S. v. Austin,* 129 N. C., 534; *S. v. Flemming,* 130 N. C., 688; *S. v. Wilcox,* 132 N. C., at p. 1137-38; *S. v. Willoughby,* 180 N. C., 676; *S. v. Blackwelder, supra; S. v. Sigmon, supra.*

In an analysis of the evidence, let us consider:

(1) *The corpus delicti—the body of a crime.* In the present case, there is no question as to the *corpus delicti.* On 24 March, 1928, some men were fishing in the Cape Fear River above Avent's Ferry Bridge. D. F. Osborne, a witness for the State, testified that about 11 o'clock at night he heard an automobile approaching the bridge from the Chatham County side. "I heard a woman's voice screaming, 'Don't kill me; please don't kill me,' two or three times. Then for a few minutes the cries closed, and I heard the sound of a large splash or some large object fell into the river, and in a minute or two somebody struggling in the water and crying out, 'Save me,' 'Lord have mercy, save me.' 'Help! Help!' We got Mr. Harrington (a deputy sheriff), also his brother, and got back to the bridge around 1 o'clock, maybe 1:30. I heard the same woman's voice, but much weaker, calling for help from down the river below the bridge. Sounded like it was three or four hundred yards down the river. Mr. Harrington and Dickens got in a boat and went down the river toward it, but it ceased before they got there."

Mrs. Mary Yandel, a daughter of Mrs. Annie Terry, on 3 April, 1928, identified the body of her mother down the river about three miles from the bridge. "She had bruises on her face and head."

(2) *The motive.* "It is never indispensable to a conviction that a motive for the commission of the crime should appear. But when the State, as in this case, has to rely upon circumstantial evidence to establish the guilt of the defendant, it is not only competent, but often very important, in strengthening the evidence for the prosecution, to show a motive for committing the crime." *S. v. Green,* 92 N. C., at p. 782; *S. v. Stratford,* 149 N. C., 483; *S. v. Wilkins,* 158 N. C., 603.

Fifteen letters were introduced in evidence from defendant to Mrs. Annie Terry, all signed "Rover." Mrs. Terry had been a widow for some fifteen years before she was killed. She and defendant lived in Durham—defendant in the same apartment in which his niece and her husband lived, but was a contractor and the letters indicated was away mostly at work. A great number of the letters were in reference to Saturday night engagements. One requested her to come to Salisbury Sunday night to see him. A number of letters mentioned that he would phone her. Two of the letters mentioned that when he got there Saturday night he would phone her about 7 o'clock, and one that they would go for a ride; one, "I think my people are going to be out of town, and if they are we can make things all O. K." One of the letters in which he wishes her to "come part of the way back with me Sunday evening and go back Monday morning," had written below *"Burn this."* One letter, of 27 September, 1927, said: "I don't see what you keep on about women for, as I have not hardly spoken to a girl since I have been here. I have tried to be good to you, and told you the truth on all occasions, and I can't see to save my life what pleasure you get out of trying to make my life so unpleasant for me. If there was any reason for it, it would be different. But it certainly does hurt me to get such a letter with no cause." Another letter says: "This is another case of where you let your imagination run away with you, and I am getting tired of getting such letters, when there has never been any cause for one, and it looks like to me that you could realize that some time." A letter which seems to have been written in December, 1927, says: "Now if you let him know anything, it will mean that I will have to leave this country, for he has not got any sense about such things, and I think it will be to your benefit to think before you say too much."

The letters indicated an illicit relationship. Mrs. Annie Terry kept these letters. Defendant, from the letters, knew he was dealing with a woman he could not trifle with. The defendant and Mrs. Annie Terry were passed middle age, and it was in evidence that defendant said to one W. B. Cheek, in a conversation about 1 March, that he was going to get married. It was in evidence that he told Sheriff G. W. Blair he was going to get married. "He gave me the lady's name and address at Cooleemee; that he finished the letter about 9 p.m.; that he didn't want the lady's name in it; that he was engaged to her." He wrote her the night of 24 March. The defendant's motive was to get rid of this "old glove" and marry the Cooleemee fiancee.

(3) *Identity of defendant as the one who committed the crime, and contradictory statements.* The Lawrence home place, owned by defendant's father, who is dead, and now owned by the heirs, is located about a mile and a half east of Avent's Ferry Bridge, and the heirs own

the land on the Chatham County side of the river to the bridge. The water in the river where Mrs. Annie Terry was thrown in is some 18 to 20 feet deep. Defendant was raised at the old Lawrence home place. The State contends that it is reasonable to infer that defendant in his boyhood days hunted along the river bottom and fished and boated in the river; knew its depth and was familiar with the surroundings. The piers and bridge were finished the fall previous. Defendant was at Brick Haven, some two miles away, two or three weeks before the murder; he was familiar with the bridge and surroundings.

Two fishermen were some 300 or 400 yards above the bridge. One of the fishermen, D. F. Osborne, testified that the car Mrs. Annie Terry was in before she was thrown into the river came on the bridge from the Chatham County side. This was about 11 o'clock on the night of 24 March. "I heard a woman's voice screaming, 'Don't kill me; please don't kill me,' two or three times. Then for a few minutes the cries closed, and I heard the sound of a large splash or some large object fell into the river, and in a minute or two somebody struggling in the water and crying out, 'Save me,' 'Lord, have mercy, save me.' 'Help! Help!' Heard this cry several times. Soon after the body struck the water the car moved on across the bridge to the Lee County side, and as it was going off the bridge the screams and cries seemed louder and more pitiful than ever, and the car turned around and came back up on the bridge. As it drove across I heard a heavy voice talking to some one in the water, but could not distinguish what was said. The car didn't stop, but moved across to the Chatham County side, turned around and drove on the bridge again, and stopped, turning out the lights. It was a smooth-running, gear shift car, and sounded like it was new." The fishermen went after Deputy Sheriff Henry Harrington and another, and returned in about an hour and a half. Harrington got a boat and he and another went down the river. A voice was heard "kind of in distress"; "after the voice hushed." Harrington testified: "I saw and examined the road there at the Lee County end of the bridge and the Chatham County end of the bridge. I saw some automobile tracks at those places; *they were still distinct and well marked,—pretty plain.* The ground there at that time was *just soft enough for a car to make a good print—make a good plain print.* I noticed it on both sides of the river after they said the car turned around on both sides. I went to both sides and looked down there and found some prints on both sides of the river. . . . I have seen the automobile that Sheriff Blair has in his possession—a Nash coupe—green coupe. I have examined the tires on that car. I have not observed the tracks made by those tires; I just saw the car sitting in the garage and observed the casing. *I would say that the*

*marks on the casing of that car were the same as the marks and tracks I saw on the bridge—Firestone tread."*

There were blood spots on the third or fourth span of the bridge as big as a man's hand, and a little bit of blood on the inside and outside of the railing. It looked like fresh blood and strands of hair in the big spot of blood.

Charlie Goodwin testified: "On the night of 24 March, 1928, my wife and I, who had been to Sanford, N. C., were returning to our home, which is about two and one-half miles or three miles from Avent's Ferry Bridge, in Chatham County, N. C. We crossed the bridge at 11 o'clock, because it was eleven minutes past 11 when we got home, and I estimate that it took about eleven minutes to drive that distance. As we approached the bridge from the Lee County side I saw an automobile on the bridge with its lights burning, but as we got nearer the lights were turned out. *It was a green, one-seated car with wire wheels.* The wheels were not the same color of the car, but I do not know what color they were. I did not see who was in the automobile. My wife was on the front seat, but I was nearer the other automobile than she. My wife told me there was a man in the car, and as we passed he turned his head toward her; *that he was a stout, broad-faced man.* I have seen the automobile which is in the possession of Sheriff Blair and which belongs to the defendant, and *it looks like the one I saw on Avent's Ferry Bridge that night."* Mrs. Goodwin corroborated her husband: "As we passed I saw a man in the car which was on the bridge. *He turned his face directly toward me. He was a stout-built man with a broad face, clean shaven.* The car in which he was sitting had a glass on the sides and the glass on the side next to me was half way down. The man appeared to be a middle-aged man. I did not see anybody else in the car. *I know the defendant, and the man in the car looked like him, but I will not say that it was. My impression is that it looked like him."*

H. E. Holland testified: "About 1 o'clock a.m., on the morning of 25 March I was traveling South along highway No. 50, and after leaving Apex, N. C., I passed two automobiles going north. As I approached a curve I was traveling forty or forty-five miles an hour, and the two cars which I met were traveling from thirty to thirty-five miles an hour. The rear car pulled out as if to pass the car in front and then *the driver of it put his head out of the window so that I could see him. He looked like the defendant.* I do not know the defendant, and never saw him again until after this trial started, when I was told that he would be brought from the jail, and I was told to sit in the hall of the courthouse downstairs. *When he came by I thought I recognized him as the man I saw in the coupe on the early morning of 25 March, 1928.* The night was misty and there was a mist on my windshield. The reason I was

particular and watching occupants of cars was because I had in my pockets between $600 and $700 in cash, receipts from my filling station at Oxford. Shortly after I passed this car, and about one mile from Apex I found lying on the concrete paving of the road *a woman's blue felt hat without any brim.* When I found it I saw it was dry—not rained on and had not been run over or touched by any automobile. *On the inside was a blood stain as large as a quarter of a dollar.* This hat is the one Deputy Desern and McCauley have, and is the hat now exhibited to me. I carried it home in my car that night and gave it to the sheriff Tuesday following. *It is the hat Mrs. Yandel identified as worn by her mother the night she was murdered."*

G. W. Blair, sheriff of Chatham County, testified: "I was called upon to investigate the affair at Avent's Ferry Bridge about 10 o'clock Sunday, 25 March. . . . I examined the roadway at the end of the bridge on the Lee County side. *I examined the tracks of the automobile closely; the print of the tire was distinct and clear. I know the automobile of W. H. Lawrence, and have examined the tread of his car, and the same kind of tread made the track."* As to his conversation with the defendant, he testified: "I was sheriff and asked him to give us information about Mrs. Terry. *At first he denied knowing her.* He said that he would be glad to, but that *he only knew Mrs. Terry slightly;* that he knew of no one who had any enmity towards Mrs. Terry. *He said that he had never been with her; that she had never been in his automobile;* that he was sure of that; that he only slightly knew her; he said he didn't know how she made a living; *that he had never loaned her any money;* that he never thought of such a thing. I asked him if he ever sent Mrs. Terry $100 to Atlanta; he hung his head and admitted that he did. Then he said he had once carried Mrs. Terry and Mrs. Andrews in his automobile to Winston-Salem. Then he said one time he brought her from Greensboro to Durham; and he said the last time he spoke to Mrs. Terry was when he carried her to Winston-Salem. . . . He said 'Jesse Cannady and myself sat on the pipe railing at the Trust Building from 8 to 8:30.' *He said that he then went to his office and wrote his girl a letter; he gave me the lady's name and address at Cooleemee;* that he finished the letter about 9 p.m.; that he didn't want the lady's name in it; *that he was engaged to her;* that he mailed the letter; that he saw Jesse Cannady again and spoke to him at the Sport Shop; that he then got his automobile and went to Grigg's Filling Station, where he got some oil and had the alcohol drained out of his radiator; *that he went home at 9:30 p.m., and went to bed.* . . . Said that he crossed the bridge at Avent's Ferry the last time three or four weeks before that time, that time being 11 April; that Mrs. Terry had said on the Winston trip that she liked him, but that he turned it off because he would not

STATE *v.* LAWRENCE.

marry a woman with a house full of children; that he spent the night, when he took Mrs. Terry and Mrs. Andrews to Winston-Salem, at the Robert E. Lee Hotel; that Marvin Teer introduced him to Mrs. Terry eight years ago; that he had been drinking the time he went with Mrs. Terry to Chapel Hill; that he didn't know his dry-cleaner's name. Mr. Lawrence gave us his automobile key and told us where his automobile was located, and Mr. Hall and Mr. King went and got his car. I looked in the car. *I examined the tracks—the tracks of the car—and they were exactly the same as those I saw at the bridge. We found blood spots or stains in the car;* it is a Nash coupe. I found three or four blood spots in it; *that evening we found eight or nine on the box back of seat on the right-hand side, just back of a person's neck sitting in the car; the steering wheel is on the left side.* On the right-hand rear fender there were stains which appeared to be blood stains. In front of where a person sits on the right side there appears to be a blood spot. *I would not say positively that any of the stains were blood stains.* After examining the car I asked Lawrence if he had done anything that would cause blood to be in the car; at first he said 'No'; then he said a man did get in his car with a package of meat some time back. I asked him who the man was and he studied a minute and said he didn't know his name; then he said about two weeks before he cut his finger in his car, and it bled freely while sitting in the car; he held up his thumb and forefinger— I think on his right hand; I didn't see any scar; he said he cut his finger in closing his knife. He was arrested afterwards. . . . Mr. Lawrence spoke to me about owning land near the bridge. He said he had crossed the old Ferry flat. *Mr. Desern asked him what way he went to the Ferry, and he said he usually went down No. 10 and up No. 50; that way leads by Cary and Apex.* The Brick Haven road was built some time ago. The distance from Durham to Avent's Ferry Bridge by Pittsboro is 48 to 48½ miles; by Route No. 10 and Merry Oaks by No. 50 it is 47 or 48 miles. . . . Mr. Lawrence said two or three times, 'Sheriff, I think when you trace it up you will find some one else beside me.' There was no objection by Mr. Lawrence as to giving up his key to his automobile."

The undertaker, Warlick, testified: "I took charge of the body of Mrs. Annie Terry. I made a thorough examination of it and found several wounds and bruises. *There was a hole in the side of the head behind the right ear about the size of a quarter of a dollar,* a swollen bruised place behind her left ear, with the scalp cut, her lips and mouth were swollen and bruised as if by blows, *across her forehead were several bruises about the size of a lead pencil running diagonally, as if struck with some instrument, and on her upper arms bruises, and underneath her forearms bruises, about the size of your finger, as if inflicted while*

*her arms were raised upwards in front of her face above her head,* and a large bruise on her thigh. . . . I got the body at the river about three miles below Avent's Ferry Bridge. It was clothed. She did not have on any coat *or hat,* and no pin or jewelry of any kind except a small ring, was on her person."

G. A. Allison testified: "I am telegraph operator and railway station agent at Cooleemee, N. C., and was living there in 1927, and I knew the defendant who spent some time there. The defendant's general character was good while he was at Cooleemee." This witness identified a telegram to the defendant from Atlanta, Ga., dated 17 June, 1927, signed, "Annie," asking the defendant to telegraph her $200 to No. 1268 DeKalb Avenue, Atlanta, Ga.; a telegram from the defendant to Mrs. Annie Terry, No. 1268 DeKalb Avenue, Atlanta, Ga., reading as follows: "Impossible to send two, wire if one will do any good. Herbert." And a telegram to the defendant from Atlanta, Ga., signed "Annie," dated 28 June, 1927, reading as follows: "One will do. Annie."

J. E. Johnson testified: "On 29 June, 1927, I was in charge of the Western Union Telegraph office in Salisbury, N. C., and my records show that on that date $100 was telegraphed to Mrs. Annie Terry, No. 1268 DeKalb Ave., Atlanta, Ga., by a person signing his name 'W. H. Lawrence.'"

Geo. H. Brooks, coroner of Chatham County, testified: "Pursuant to the order of Judge Nunn, took possession of the automobile of the defendant, W. H. Lawrence. *It was a Nash, with wire wheels and Firestone Balloon tires.* It has one seat inside and a rumble seat in the rear. It was a sport made coupe, six cylinder car, practically new. *I examined the automobile thoroughly and found a number of spots on the back rest of the seat inside and on a ledge at the top of the back rest which I think looked like blood.* There were also some spots near the edge of the seat on the right-hand side and some on the dashboard *which looked like blood.* There were other spots on the outside of the car, namely, on the hood, the fenders, the door and one spot on the back rest of the rumble seat which looked like blood."

W. R. McCauley, deputy sheriff of Lee County, testified: "I went to Avent's Ferry Bridge and *examined imprints of automobile tires at both ends of the bridge* which were pointed out to me. I have since examined the tires of the automobile belonging to the defendant and *the imprints which I saw at both ends of the bridge were similar to the tread of those tires.* I also saw some spots inside of the defendant's automobile *which looked like they might have been made by blood.* There were a few small spots, the largest one was about the size of the nail of my little finger and the others were similar. *I am satisfied they were blood.*"

C. T. Desern testified: "I think it rained a little something towards 11 or midnight; something like that; possibly rained just a little. I would suppose it is between twenty and twenty-five miles from Apex to Avent Ferry Bridge by Route 50. . . . This document is out of the register of the Robert E. Lee Hotel at Winston-Salem, under the date of the eighth month, eighth day, 1927—8 August, 1927. I got that out of the original record. I have seen W. H. Lawrence's handwriting, and would know it if I were to see it again. Those three names—W. H. Lawrence, Mrs. C. Andrews, Mrs. W. M. Terry—are in the handwriting of W. H. Lawrence. . . . *While talking to Sheriff Blair the defendant was nervous, and his lips trembling, his voice breaking, and apparently frightened."*

L. L. Ford: Identified the register sheet of his hotel (Empire Hotel of Salisbury, N. C.), of Sunday, 4 December, 1927, upon which appeared the name "W. H. Lawrence, Burlington, N. C.," the writing being identical to that of defendant, and just above the defendant's name there appeared the name "Mrs. Raeford Terry (same as Mrs. Annie Terry), Durham, N. C." . . . "The photograph of Mrs. Annie Terry looks like the lady who came in the Empire Hotel with the defendant. They both left the next day."

Defendant's automobile was brought by Coroner Geo. H. Brooks from the home of the sheriff of Chatham County to the courthouse green, *where it was viewed by the jury, at which time the coroner pointed out to the jury the spots, or some of the spots, which he had testified to previously.*

During the trial defendant attempted to commit suicide. John Burns, deputy sheriff of Chatham County, testified: "I had the defendant, W. H. Lawrence. I put him in the cell Friday night, 18 May, right about sundown, the best I remember. He seemed all right, in good shape when I put him in the cell. The next time I saw him after I put him in there was about 6:25 the next morning. The cell door was locked and I had the key. There is no other key to it; no one had access to the cell during the night. When I saw him the next morning at 6:25 his throat was cut. I couldn't say how bad he was cut; he was cut right much; he bled right much. There was a cut across his wrist on the left hand. When I saw him he was lying on his back on the bed in the cell. I went in the cell to turn out a prisoner that works here on the road that has been tried and sentenced on the road for six months in this county now. I went in as quietly as I could. Friday, the morning before, the door slammed and woke Mr. Lawrence up, and I told him that I would try to be quiet next morning and not wake him up, and I went in as quiet as I could—so as not to disturb him—and while I was unlocking the door where this prisoner was in the cell next to his, he called me and said,

'Mr. Burns, I wish you would give me your gun,' or 'let me have your gun.' I said, 'Mr. Lawrence, you don't need no gun.' I thought he was just kidding me. He said he wanted to finish the job. I said, 'Mr. Lawrence, what in the world,' and he said, 'Mr. Burns, they are framing up on me, and it is more than I can stand.' There was a little safety razor blade in his left hand, in his fingers. . . . I would estimate that he had bled half a gallon. . . . Mr. Lawrence gave me a letter; he told me there was a note there on the bed. My hands were bloody and some one else put it in my pocket, and I think I gave it to Harry Norwood. I think this is the note." The witness read the note, which is as follows: "To all my friends: Since they have started lying so much, it is impossible for me to stand it any longer. So please pardon me for this act I am about to commit. You all know I am not guilty, and I am being lied on by some, and the worst ones for that are still to come, so this is the shortest way out. Good-bye to you all. W. H. Lawrence." Witness continued: "The wound was on the right side of his neck. I could estimate it to be about four or five inches long. It looked to be. Mr. Lawrence told me that they were framing up on him, and that he could not stand it. He told me also that he was not guilty."

Jack Womble testified: "I lived at Merry Oaks, N. C., on 24 March, 1928, and was working at a filling station there; between 10 and 11 o'clock that night a *green coupe automobile* came to the filling station *occupied by a man and a woman;* it was *a green coupe with wire wheels.* The man called for two soft drinks, which I went back to the filling station and got and took them to the automobile. The man in the car had a broad face, broad shoulders, and was clean shaven. It was about 10:30 o'clock when the car drove up to the filling station. When it left it went south for a few hundred yards, turned to the left, *crossed the railroad and turned into the Avent's Ferry road,* passing out of my sight. Only one other car, a Ford, crossed the railroad going that way on that night. I told Mr. Desern, deputy sheriff, about it. *The woman in the car was a settled aged woman.* There was no one at the filling station but me. Neither one of the occupants of the car got out. It started off after staying there for three or four minutes. I never saw the defendant until I saw him here at the courthouse. *I think the man in the automobile looked like him, but I will not swear that it was him."*

Q. "Now I want to ask you, this man is being tried for his life, if you will undertake to swear definitely and positively that the man that you saw in that automobile was Mr. W. H. Lawrence?" A. "No, sir, *I would not swear so, but I think it was."*

Dr. C. A. Shore: "I am a physician and I am director of the State Laboratory. I have had experience with the microscopic examination of blood. I have been in my present position for twenty years. I see blood

almost every day under the microscope and make microscopic examination of the blood cells almost every day. I recall a green Nash coupe automobile which was brought to my laboratory by Mr. Brooks, the coroner of this county. I made a microscopic examination of the stains or spots on the inside of that car and upon the seat. *I think some of those spots were blood spots."*

*The movements of Mrs. Annie Terry, Saturday, 24 March, 1928.* In the evening she took supper at her own home with a married daughter, Mrs. Mary Yandel, and her two sons, Robert and Edgar Terry. The telephone rang and the deceased answered it, but no one heard the conversation. This occurred a little before 7 p.m. After supper, and after Mrs. Yandel had left, the deceased changed her clothes and asked her son, Robert Terry, to take her in his automobile to the bus station in Durham. They left the house about 7:20 p.m. When, however, they had reached Kronheiner's store on Main Street, which is about four and one-half blocks from the bus station, at her request her son stopped the car and let her out there. None of her children saw her again until after her dead body was found, on 3 April. Mrs. Annie Terry, the deceased, appeared that night between 7:30 and 8 o'clock at the store of Oren Holmes and remained not more than two minutes. This store is about two blocks south of the Union Bus Station. The same night, soon after Mrs. Terry was seen at the store of Holmes, Robert Dixon saw some one in an automobile, among a number of other automobiles, at the corner of Holloway and Dillard streets, whom he recognized as the defendant. Some one was with him, but he could not see who it was, nor whether it was a man or woman. All of her children testified that Mrs. Terry was wearing a dark blue felt hat which had no brim, and one of them testified that she also had on a coat with fur collar and cuffs. No one who knew her personally saw her afterwards until her dead body was taken from the river on 3 April.

The North Carolina Highway System map was put in evidence to indicate the routes.

The defendant introduced numerous witnesses as to his general reputation being good. That there were no blood spots on the car. Relied on an alibi and contradiction of some of the State's witnesses. Defendant cites *S. v. Brackville,* 106 N. C., 701; *S. v. Goodson,* 107 N. C., 798; *S. v. Gragg,* 122 N. C., 1082; *S. v. Montague,* 195 N. C., 20, and cases from other jurisdictions. See *S. v. Prince,* 182 N. C., 788.

The defendant contends that the State has utterly failed to make out a case against defendant. That "this Court has decided in a number of the cases hereinbefore cited that the State must offer legal evidence sufficient to establish the guilt of the accused. We believe that the weakest of the cases cited contains more evidence in favor of the State than the

case at bar. Conversely, the case at bar is weaker than any of the cases which this Court has held were too weak to be submitted to a jury."

(1) *As to the identification of the automobile tracks* at the bridge being like those made by defendant's car, *S. v. Brackville, supra,* is cited by defendant. It is said in that case, at p. 709: "That his tracks were seen by one witness as if he were going from the place where the body of the deceased was found towards the house from which he was taken, but this evidence was not definite or satisfactory. So far as appears, the tracks were not scrutinized; they were not measured; the prisoner's feet were not measured or fitted to the tracks, nor did it appear that his feet were at all peculiar in any respect, nor did the witness say how she knew the tracks were his. . . . (p. 710). Leaving out the evidence as to the tracks, the leading facts, whether taken severally or collectively, and in their combined force, were not necessarily inconsistent with his innocence. As we have seen, the evidence as to the tracks was very unsatisfactory."

Standing alone, this evidence was slight. It was in evidence that defendant had a new green Nash coupe. It had on it Firestone tires—treads on the casing; these made marks or tracks. The car on the bridge from which Mrs. Annie Terry was thrown into the river, stopped, crossed the bridge and turned around and crossed to the Chatham County side, and then went back on the bridge. The same night, and a few hours afterwards, the tracks were examined. The ground was just soft enough for a car to make good plain prints, and they were described by the witness, "They were still distinct and well marked—pretty plain." It was in evidence that a car was on the bridge at 11 o'clock at night with lights burning, and as the witness Goodwin got nearer the lights were turned off. The man was in *"a green one-seated car with wire wheels."* The witness saw the car owned by defendant. *"It looks like the one I saw on Avent's Ferry Bridge that night."* His wife, who was with him, testified that she knew defendant *"and the man in the car looked like him."* Taking all these facts, it was a circumstance with other circumstances that were relevant to the inquiry. See *S. v. Matthews,* 162 N. C., 542; *S. v. Trull,* 169 N. C., 363; *S. v. Young,* 187 N. C., 698.

(2) *As to opinion of blood spots on the car,* Dr. C. A. Shore testified: "I think some of those spots were blood spots." W. R. McCauley, "I am satisfied they were blood." And other evidence to the like effect as to their opinion that it was blood on the car were circumstances and were relevant to the inquiry.

(3) *As to the identity of defendant:* (a) "I know the defendant, and the man in the car looked like him, but I will not say that it was. My impression is that it looked like him." (b) "He looked like the defendant. . . . When he came by I thought I recognized him as the man

I saw in the coupe on the early morning of 25 March, 1928." · (c) "I think the man in the automobile looked like him, but I will not swear it was him. No, sir, I will not swear so, but I think it was."

This kind of evidence has frequently been held to be admissible in this jurisdiction. In *S. v. Costner,* 127 N. C., at p. 572, it is said: "She was asked by the Solicitor, 'What is your opinion, from what you saw of the man that night, as to who it was?' She answered, 'The figure in the room that night compared more favorably with Wade Costner than any one else I could think of in that community.'"

In *S. v. Carmon,* 145 N. C., at p. 484, it is said: "The witness George Kluttz testified that he knew the defendant and had known him for two months; that, while it was dark when the assault was committed, he 'got a glimpse' of him just after the pistol was fired, a second only intervening, and that he 'thought' it was and 'took it to be' the defendant, the latter being only fifteen feet from him at the time. His father stated that, while his vision was obscured by the fact that he was looking from a lighted room, his store, into the darkness without, and it was almost impossible for that reason to recognize a person, yet he 'threw his eyes around' immediately after the firing of the pistol and saw a person whom he 'took to be' the defendant, and he also saw a pistol in his right hand, or something that looked like one. He further stated that the defendant ran in the direction of the Climax Hotel, though it .appeared that this was not in the direction of his home. It seems to us that this testimony is as strong as that which, in *S. v. Lytle,* 117 N. C., 803, was permitted to go to the jury, and upon which their verdict and the judgment were sustained by this Court. Indeed, we are of the opinion that the testimony in this case is much stronger than the testimony of the witness John Dawkins was in *S. v. Lytle.* He testified in that case as follows: 'I recollect the night when the barn was burnt. I met a man whom I took to be Lytle in the road, near my house. He was a low, chunky man. It was too dark to see whether he was white or black. He had his back to me; had on a dark sack coat. I have known Lytle ten years; have seen him often. Had I spoken to him I would have called him Lytle.'"

In *S. v. Lane,* 166 N. C., 336, it is said: "The testimony of E. Hillman that the man he saw coming towards Joab Lane's house looked like the defendant, was competent in connection with the other evidence of identity."

In *S. v. Walton,* 186 N. C., at p. 489, it is said: "The exception that the court permitted the witness Jones to testify that he took the man who held him up at the crossroads that night to be Len Walton was properly overruled. *S. v. Spencer,* 176 N. C., 713; *S. v. Lytle,* 117 N. C., 803, and *S. v. Thorp,* 72 N. C., 186."

(4) *The attempt to commit suicide.* This evidence is in the record, and it has been held that such a circumstance is competent to be considered by the jury, when determining the guilt of· defendant in connection with other circumstances.

In *S. v. Dickerson,* 189 N. C., at p. 331, it is said: "In *S. v. Case,* 93 N. C., 546, it is said: 'In criminal cases every circumstance that is calculated to throw light upon the supposed crime is admissible. *S. v. Swink,* 19 N. C., 9. The fact that immediately after the discovery of the crime the person charged with its commission flies (fled), is admitted as a circumstance to be considered by the jury. *S. v. Nat,* 51 N. C., 114. So it is held that if the prisoner, when arrested, attempts to make his escape, or attempts to bribe the officer to let him escape, the evidence is admissible. 11 Ga., 123; *Fanning v. State of Missouri,* 14 Mo., 386; *Dean v. Commonwealth,* 4 Grattan, 541; 26 Ia., 275.' In *S. v. Tate,* 161 N. C., 286, it is held: 'But such flight or concealment of the accused, while it raised no presumption of law as to guilt, is competent evidence to be considered by the jury in connection with the other circumstances. 12 Cyc., 395; 21 Cyc., 941.'" *S. v. Hairston,* 182 N. C., 851; *S. v. Stewart,* 189 N. C., at p. 347; *S. v. Adams,* 191 N. C., at p. 527; *S. v. Mull, ante,* 351; *Commonwealth v. Madeiros,* 255 Mass., 304, 47 A. L. R., 962.

It is said in *S. v. Steele,* 190 N. C., at p. 511, speaking of flight: "The basis of this rule is that a guilty conscience influences conduct. From time immemorial it has been thus accepted. 'The wicked flee when no man pursueth; but the righteous are bold as a lion.' 28 Prov., 1. 'Thus conscience doth make cowards of us all.' Hamlet, Act III, scene 1. 'Guilty consciences always make people cowards.'—The Prince and his Minister, Pilpay, ch. III, Fable III."

Suicide is in the nature of flight. In *S. v. Blancett,* 24 New Mexico, 433, 174 Pac., at p. 209, the following observations on the subject are made: "It is next contended that the court erred in admitting in evidence and in instructing the jury that it might consider proof of the attempt of the appellant to commit suicide. It is urged in this connection that proof of the attempted suicide is not analogous to flight and does not involve any suggestion of guilt. It is urged that in the case of *S. v. Coudotte,* 7 N. D., 109, 72 N. W., 913, the Court held that there is no presumption of guilt arising from the fact that the person charged with crime, and while in confinement and before trial, attempts to commit suicide. It is suggested that the case of *S. v. Jaggers,* 71 N. J. Law, 281, 58 Atl., 1014, 108 Am. St. Rep., 746, while holding to the contrary, it is not supported by reason or authority. We, however, do not agree with appellant's contention in this respect. Other than the cases cited by appellant, our attention is directed by the State to the case of *People*

*v. Duncan,* 261 Ill., 339, at 353, 103 N. E., 1043, 1049. The Supreme Court of Illinois in that case held that: 'The fact that defendant attempted to commit suicide was a circumstance which was properly to be taken into consideration by the jury in connection with all the other facts and circumstances proven.' "

In the present case defendant was *sui juris*—a man of mental and physical vigor, perfectly normal. He had been leading a double life, his trial was on, he could not stand the humiliation and disgrace, and in his endeavor to escape the punishment, he anticipated from the evidence adduced, he attempted to kill himself. This is somewhat akin to flight.

*The automobile was viewed by the jury,* and some of the spots pointed out to them. The power of the court below to order a view by the jury is set forth in *S. v. Stewart,* 189 N. C., p. 345. In the present case there seems to have been no objection.

It is sometimes difficult to determine what is and is not sufficient evidence to be submitted to a jury. Under the Constitution of this State, this Court has jurisdiction upon appeal to review any decision of the courts below "upon any matter of law or legal inference." It is the province of the jury to determine the facts and that of the court to state the law. The right of trial by jury has ever been closely allied with the cause of human liberty. "The right of trial by jury," says *Mr. Justice Story,* "is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment on it has been watched with great jealousy. The right to such a trial is incorporated into and secured by the constitution of every State in the Union. In Magna Carta the basic principle of that right is more than once insisted on, as the great bulwark of English liberties, but especially by the provision that 'no freeman shall be hurt, in either his person or property, unless by lawful judgment of his peers or equals, or by the law of the land.' "

The jury has convicted the defendant of murder in the second degree. If this verdict is premised on sufficient evidence it must stand under the law. This Court cannot erect a despotism of five men. If, on the other hand, it is premised on conjecture, suspicion or mere scintilla, it is the duty of this Court to so declare. *S. v. Swinson, ante,* 100. We are constrained to decide as a matter of law that the evidence was sufficient to be submitted to a jury and the probative force was for them.

*The links in the chain of circumstantial evidence.* The defendant and Annie Terry, from the evidence, had for years been engaged in secret illicit relations. They were settled-aged man and woman. They seemed to get together generally on Saturday nights, both living in Durham, and he, being a contractor, coming home for the week-ends. She had carefully kept some fifteen of his letters, he signing all of them "Rover."

She even kept the one he had written on, "Burn this." It seems that she had upbraided him about women. He warned her in one letter not to say too much, or he would have to leave this country. He would phone her and they would go for a ride, or other arrangements be made for their meetings. At one time she went to Salisbury to meet him. He sent her money to Atlanta. The telegrams between them were signed "Herbert" and "Annie." The time had come when the illicit relationship had to cease. He became engaged to marry another woman. Annie Terry was thrown in the river at Avent's Ferry Bridge at about 11 o'clock on 24 March, 1928. This bridge was some forty-eight miles from Durham, and defendant usually went to the ferry down No. 10 and up No. 50, by the way through Cary and Apex. At 9 o'clock that night he stated that he went to his office and wrote his fiancee at Cooleemee a letter and mailed it. He said he went home at 9:30 and went to bed. That evening Annie Terry was at her home; took supper with her children. The telephone rang; she answered it. This was about 7 o'clock. She changed her clothes and asked her son to take her to the bus station, but she got out of his car some four and a half blocks from the bus station. The last trace of her in Durham, from the evidence, was between 7:30 and 8 o'clock at Oren Holmes' store about two blocks south of the Union Bus Station. She was wearing a dark blue felt hat which had no brim. The evidence would indicate that after defendant wrote the letter to his fiancee, by telephone or otherwise they got together as usual on Saturday nights. Defendant had a new green Nash coupe, Firestone tread on the tires. He was raised at the old homestead, his father now dead, and he and the other children inherited the land that ran to the river and Avent's Ferry Bridge, where the murder took place. He knew the river, the depth of the water at the bridge 18 to 20 feet. His motive was to get rid of her so he could marry his fiancee, to whom he had written that night. He and she got in his car. He could easily drive to the Avent Ferry Bridge in an hour or so. He drives from Durham down No. 10 to Cary, then on No. 50 to Apex, and then to Merry Oaks. Jack Womble was working on the night of 24 March at a filling station at Merry Oaks. About 10:30 o'clock that night a green coupe with wire wheels, occupied by a man and a woman, drove up. The man called for soft drinks, which Womble got and took to the car. The man in the car had a broad face and shoulders and was clean shaven. The defendant answers this description. The woman in the car was a settled-aged woman. The car did not continue down No. 50 towards Sanford, but he watched it go south for a few hundred yards, turn to the left, cross the railroad and turn into the Avent Ferry Bridge road. Womble testified, "I think the man in the automobile looked like him (defendant), but I will not swear that it was him. I would not swear so, but I

think it was." The death car reaches Avent Ferry Bridge. The fishermen hear the pitiful screams and cries of a woman, and a sound as if some one had been thrown into the water. The car that came upon the bridge was a smooth-running gear-shift car, and sounded like it was new. The car, after the woman had been thrown in the river, moved across the bridge to the Lee County side, turned around and came back, crossed the bridge and then came upon the bridge again, stopped and the lights were turned out. A heavy voice was heard talking to some one in the water. Some hour and a half after, the rescuing party heard a voice down the river in distress, and the voice soon hushed forever. The body of Annie Terry was found on 3 April down the river about three miles. There were blood spots on the third or fourth span of the bridge as big as a man's hand, and hair and blood on the inside and outside of railing. The undertaker testified her lips and mouth were swollen and bruised as if by blows across her forehead, and other bruises as if struck by some instrument, and bruises inflicted while her arms were raised upward in front of her face above her head. When the body was found she did not have on a hat. Defendant's car was examined thoroughly and a number of spots which looked like blood were found on the back rest of the seat inside and on a ledge at the top of the back seat. This was on the side the woman sat. There were other spots on the outside of the car. Dr. Shore, who made a microscopic examination of the spots, testified, "I think some of those spots were blood spots." At 11 o'clock Charlie Goodwin and his wife came by, and as he approached Avent Ferry Bridge from the Lee County side he saw an automobile on the bridge with its lights burning, as they got nearer the lights were turned out. He testified that it was a green, one-seated car, with wire wheels. The man in the car was stout, broad-faced, the description corresponding to defendant and his car. The automobile of defendant looked like the one he saw on the bridge that night. His wife testified he turned his face directly towards her; he was a stout-built man with a broad face, clean shaven. "I know the defendant, and the man in the car looked like him, but I will not say that it was; my impression is that it looked like him." The man on Avent's Ferry Bridge starts back towards Durham via Apex and Cary. H. E. Holland was watching the road closely, as he had a large sum of money in his pockets, and was traveling south along No. 50. After leaving Apex he passed two automobiles going north, in front a sedan, behind a coupe. The coupe passed the sedan and the driver put his head out of the window; he could see him. "He looked like defendant." At the time of the trial he testified: "When he came by I thought I recognized him as the man I saw in the coupe on the early morning of 25 March, 1928." Shortly after Holland passed the coupe, about a mile from

Apex, he found lying on the concrete paving of the road a woman's blue felt hat without any brim. On the inside was a blood stain as large as a quarter of a dollar. The hat was identified as that of Annie Terry, worn by her on the night she was killed. The man who killed her, on the return trip, no doubt, after striking her in the head the hat was knocked off in the car, and when he found it on his return, he threw it out on the road. Many witnesses testified that defendant's car had such tread tires that make a track similar to those found going on the bridge, turning around and coming back on the bridge, also the similarity of the death car on the bridge with defendant's car. These tracks were distinct and clear, and the tracks were examined closely; the ground at the time was soft enough for a car to make a good print. When confronted, the defendant denied knowing Annie Terry, then admitted knowing her slightly and made other denials, which were contradicted. To cap the climax, when the web was being wrapped around him during the trial, he attempted to commit murder and kill himself. The jury that tried him viewed the spots on his car. We think the evidence was sufficient to be submitted to the jury. Its probative force was for them. In the record we find

No error.

BROGDEN, J., dissenting: Did the defendant throw Annie Terry from the bridge at Avent's Ferry on the night of 24 March, 1928, at about 10:30 or 11 o'clock?

Avent's Ferry Bridge is on a public road. Several other public roads run into the road leading to the bridge. The bridge is neither a secluded nor a desolate place, but one much used by the public generally. While the defendant and his brothers and sisters owned as tenants in common the land of their deceased father, there is no evidence in the record that any living person had seen the defendant upon the land or traveling this particular road in twenty years.

The State relied wholly upon circumstantial evidence for conviction. The defendant by motions of nonsuit, challenges the sufficiency of the evidence and contends that the trial judge ought not to have submitted the case to the jury. Upon such motions, the defendant was entitled to have the entire evidence in the case, both for the State and himself, considered and weighed by the trial judge and viewed in a light most favorable to the State. C. S., 4643; *S. v. Killian,* 173 N. C., 792; *S. v. Brinkley,* 183 N. C., 720; *S. v. Pasour,* 183 N. C., 793. Viewing the evidence "in a light most favorable to the State" does not mean that the viewing eye shall be overindulgent, or that the viewing mind should span gaps or forge material links or supply essential deficiencies in the evidence, because the State is, and ought to be, as much interested in liberty as in punishment. In discussing this aspect of the law, *Allen, J.,*

in *S. v. Oakley*, 176 N. C., 755, wrote as follows: "It is neither charity nor common sense nor law to infer the worst intent which the facts will admit of."

It is not legally accurate to say that the weight and probative value of evidence is exclusively a question for the jury. This is true only when the jury receives the case for consideration. The trial judge is the weigh-master in the first instance, and it is primarily his duty to weigh the evidence in order to determine whether or not it is sufficient to be submitted to the jury.

What then are the tests or sign-boards which the law has set to guide the judge in determining this preliminary and fundamental question? In criminal cases the weighing tests may be classified as follows: (1) Every man is presumed to be innocent until the contrary is proved, and it is a well established rule in criminal cases that if there is any reasonable hypothesis upon which the circumstances are consistent with the innocence of the party accused the court should instruct the jury to acquit for the reason that the proof fails to sustain the charge. The guilt of a person is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence. *S. v. Massey*, 86 N. C., 658. (2) The evidence must be more than a scintilla. A scintilla is some evidence, and is defined by this Court as "very slight evidence." *S. v. White*, 89 N. C., 463. (3) "Evidence which merely shows it *possible* for the fact in issue to be as alleged, or which raises a mere conjecture that it is so, is an insufficient foundation for a verdict and should not be left with the jury." *Wittkowsky v. Wasson*, 71 N. C., 451; *S. v. Vinson*, 63 N. C., 335; *S. v. Massey*, 86 N. C., 658; *S. v. Powell*, 94 N. C., 965. (4) The evidence must reasonably warrant the verdict. In cases where the State relies upon circumstantial evidence alone, when is a verdict reasonably warranted? *Stacy, J.*, in *S. v. Melton*, 187 N. C., 481, has given a clear and comprehensive answer to this question in the following words: "It is the accepted rule of law, at least in felonies and capital cases, that where the State relies for a conviction upon circumstantial evidence alone, the facts established or adduced on the hearing must be of such a nature and so related to each other as to point unerringly to the defendant's guilt and exclude every rational hypothesis of innocence."

Therefore, in brief, a trial judge is not justified in submitting a case of this sort to the jury unless the evidence is more than very slight; creates more than a possibility, conjecture or grave suspicion; excludes every rational hypothesis of innocence and points unerringly to the guilt of the defendant.

Bearing these established principles of law in mind, it becomes necessary to analyze the evidence in order to ascertain if it measures up to the standard declared in the law.

The State relies upon five elements as tending to identify the defendant as the perpetrator of the crime, to wit: (1) Motive; (2) automobile tracks; (3) personal identity; (4) blood; (5) attempted suicide.

(1) Motive is built of substantially the following facts: When the defendant was first questioned by the sheriff he stated that he was engaged to be married. The evidence does not disclose that any specific date had been set for the ceremony. Fifteen letters were offered in evidence, written by the defendant to the deceased. Only two are dated. Of these, one is dated 29 December, 1925, and another 20 April, 1926. Another is dated 27 September, but there is nothing to indicate the year. These letters, covering certainly a period of years, indicate a desultory illicit relationship. Beyond this, they are as colorless as the mummy of the alleged Tutankhamen. They all begin with the formal salutation: "Dear Mrs. Terry," and several of them close with the prosaic farewell: "Yours truly—Rover." There is not a word of endearment or affection in any of them. There is no evidence that the deceased wanted or expected to marry the defendant. There is no evidence that the deceased knew or had reason to believe that the defendant was engaged. There is no evidence of any quarrel, fit of jealousy, ill-will, grudge or threats. These are the usual, if not universal sources, out of which motive flows. I know of no case, and none has been called to my attention, in which motive has been supposed to spring from any other source. The suggestion is that it was necessary for the defendant to be rid of the deceased so that he could at some time marry another woman. In order to build a motive out of these independent and unrelated facts three important guesses are required, to wit: (a) That the deceased in some way heard that the defendant was engaged and contemplated marriage at some indefinite time; (b) that as a result of such information she flew into a rage and threatened to "tell the world" that the defendant had been guilty of adultery; (c) that thereupon the defendant, fearing the gossip, or an accusation of adultery, or assignation, lured the deceased into his automobile, drove her fifty miles to a public bridge, buying soft drinks on the way—knocked her in the head and threw her into the river. There is not a syllable or line of evidence in the record, as I read it, to support or create any of said guesses. Essential facts cannot be supplied by conjecture or created by speculation.

Applying the standard fixed by law for measuring evidence, can it be said that the evidence of motive is more than "very slight—a scintilla"— or does it create more than a "possibility" of truth? I think not. If this conclusion is correct, then all the alleged evidence of motive is no more than a legal zero.

(2) But the State contends that the automobile tracks found at the bridge are the same kind of tracks as were made by defendant's automo-

bile; hence such tracks tend to identify the defendant at the scene of the killing. On this phase of the case the evidence is as follows: "I would say that the marks on the casing of that car (defendant's) were the same as the marks and tracks I saw on the bridge—Firestone tread." But this same witness further said: "I have not observed the tracks made by those tires (defendant's). Firestone casings are very popular, high-class tires, I think. The Firestone is a very common tire used in this country. And the tread that I saw looked like it might have been made by a Firestone tire. I am pretty certain of that. That is as much as I can say." The purport of this testimony then, is that there was nothing peculiar about the automobile track. It was an ordinary Firestone tire track, and in nowise different from any other Firestone tire track, such Firestone tires being in general and common use.

Does this evidence create more than a "possibility" that a particular Firestone tire, to wit, that of defendant, made the particular track at the bridge? If not, the track evidence is merely another legal zero.

The State, however, contends that a green Nash coupe with wire wheels was seen on the bridge and in the community upon the night of the homicide. There was evidence on behalf of the defendant, not disputed or controverted by the State, that "there are a number of coupe style automobiles which resemble the Nash coupe, among them the Diana, the Buick, and Reo." Hence, there was nothing peculiar, striking or unusual about the defendant's automobile, either in its color, wire wheels or style. There was no evidence that the deceased and the defendant had ever been seen riding together until the night of the homicide, but there is undisputed and uncontroverted evidence that the deceased on Sunday afternoon, 4 March, 1928, at about 5 o'clock in the afternoon, got in a green coupe, just like the automobile of the defendant, on a public street in the city of Durham, with an unknown man— not the defendant—and drove away. She did not come back that night. This evidence shows that the deceased, a short time prior to her death, was associating with some man other than the defendant, who drove a green coupe with wire wheels.

(3) The next link in the chain of circumstances relied upon by the State consists in what is termed personal identification of the defendant upon the night of the homicide. This identification is based solely upon the testimony of three witnesses, to wit: Jack Womble, Mrs. Charlie Goodwin, and H. E. Holland. Womble testified that at about 10:30 o'clock that night a man driving a green coupe with wire wheels in which a "settled aged woman" was riding stopped at his place of business and the man purchased soft drinks. The witness said: "The man in the car had a broad face, broad shoulders, and was clean shaven. . . . I never saw the defendant until I saw him here in the courthouse. I

think the man in the automobile looked like him, but I will not swear that it was him." Mrs. Charlie Goodwin and her husband drove across the bridge at about 11 o'clock. She said, "As we passed I saw a man in the car which was on the bridge. He turned his face directly toward me. He was a stout-built man, with a broad face, clean shaven. . . . The man appeared to be a middle aged man. I know the defendant and the man in the car looked like him, but I will not say that it was. My impression is that it looked like him." It is to be observed that the witnesses do not undertake to say that the man they saw was the defendant or that in their opinion it was the defendant, or that they "took it to be" the defendant, or that their best impression was that it was the defendant. Giving their words their plain meaning and import, these witnesses say in substance that they saw on that night a stout-built man, broad shouldered, clean shaven and middle aged, and that this man "looked like" the defendant, because he, too, was a clean-shaven, broad-shouldered, broad-faced, middle-aged man. Clearly this evidence is no more than the conclusion or deduction of the witness. *S. v. Thorp,* 72 N. C., 186. Furthermore, this testimony at most identifies only the physical type or physical class of the person on the bridge, but evidence which merely designates the accused as a member of a certain physical class is insufficient and does not, in my judgment, "warrant a verdict of guilty," particularly when the witnesses, who are very intelligent, are careful to qualify their answers so as to exclude any impression that they claimed to have recognized the defendant. The witness, Holland, testified that on the night of the homicide he was driving an automobile at a speed of about forty-five miles an hour and met two automobiles. The rear automobile was traveling at a rate of thirty-five miles or more per hour, and the driver of the rear automobile attempted to pass the one in front and put his head out of the window. This witness was subpœnaed by the State and the defendant was pointed out to him by the officers. He testified in substance that the man he saw on the road looked like the defendant. He further testified that the night was dark and his windshield was covered with mist. This purported identification made on a dark, rainy night, while two automobiles were whirling at high speed through the mist and fog, is so reckless, fanciful, and totally contrary to the common observation of men who ride in automobiles and seek to identify even an acquaintance while the automobiles are traveling at high speed that I deem it unnecessary to discuss or waste time with such statements.

(4) Another circumstance urged by the State tending to identify the defendant was the presence of certain spots on the inside of the car which certain witnesses thought were blood stains or "looked like blood stains." The largest spot on the inside of the car was about the size of

the nail of the little finger. Others were about the size of a match head. But the car was taken to Raleigh by the officers and subjected to a careful microscopic examination by Dr. Shore, an expert and director of the State Laboratory. Dr. Shore said, "As far as I am willing to go is to say that I think some of those spots on the inside of that car were stains of mammalian blood." Mammalian blood covers a wide field, from a mouse to a whale. In order to give this evidence any weight at all two important facts must be supplied by guesswork, to wit: (a) That the mammalian blood referred to by the expert and other witnesses was human blood. (b) That such blood was also that of a particular human, to wit, the deceased. The blood evidence lies so clearly and so exclusively in the field of speculation and conjecture that I deem it unnecessary to debate this phase of the case.

(5) Finally, the State contends that the attempted suicide of defendant should be attributed to a consciousness of guilt. In the big cities of the United States in 1925 there were 2,808 homicides and 4,000 suicides. In other words, suicide was practically twice as prevalent as homicide. Who is wise enough to say that the 4,000 took their own lives because of a consciousness that they were guilty of some crime and that some day they might be apprehended or written up in a newspaper? There is no decision in this State upon the competency or relevancy of such evidence. The decisions in other courts are not uniform. A diligent investigation discloses but few cases dealing with the subject. This in itself is strong proof that suicide evidence is unusual and practically unknown to the courts. The courts holding the view that such evidence is competent rest the decision upon the ground that there is some sort of intangible analogy between suicide and flight. No other reason has ever been advanced by any court. I cannot see such analogy. The impulse to escape and the impulse to commit suicide in my judgment must necessarily spring from two totally different states of mind. The Supreme Court of North Dakota in S. v. Coudotte, 72 N. W., 913, has given, in my judgment, the clearest and most logical analysis of the question to be found anywhere in the books. In holding evidence of attempted suicide incompetent and irrelevant, the Court says: "One who flees does so, generally, for the purpose of avoiding the punishment that follows violated law. One who commits or attempts suicide seeks to avoid no punishment. He deliberately accepts the highest punishment that the law could possibly inflict—death. Hence the very circumstance that raises the presumption of guilt from flight is absolutely wanting in suicide. . . . When we essay the task of accounting for suicide on any general grounds, we undertake a task that from its very nature, is impossible of performance. The human mind is so wonderfully, yet so delicately, constructed, the human passions are so powerful, yet so varied, that it is idle for any

one person to pretend to enter the consciousness of another, and account for the inner workings of that other mind. We only know that, whatever may be the motive, it is not, and cannot be, a desire to avoid punishment. . . . This being true, a jury never should be permitted to treat it as evidence of guilt." Moreover, the defendant left a bloody note declaring his innocence and stating that he was committing the act because he was being "framed" and could stand it no longer. So far as the defendant was concerned, this was a dying declaration, and surrounded with all the solemnity of other dying declarations. One thing is certain, and that is that the mind in some way gives expression to its conclusions and emotions. It is the common observation of mankind that few men are willing to launch the mortal bark upon the dark waters of eternity with a lie upon their lips. This dying declaration accompanied and explained the act, and in my judgment was far more conclusive of the motive impelling the act than of some other motive carved bodily out of the wide spaces of imagination.

It is also significant that a man named Haskins was arrested and charged with the murder before a warrant was issued for the defendant. Haskins was a married man who was offered as a State's witness, and who testified that he knew the deceased and had called on her "once or twice and took her to ride in my automobile one night." The alibi of Haskins was accepted by the officers and he was released.

I do not know whether or not the defendant is guilty. All I know is the record which I have before me. From this record the deceased was associating with other men, and the evidence does not point "unerringly to the defendant's guilt," nor does it create more than a suspicion or possibility of the guilt of the defendant. The record leaves upon my mind the impression that the horror of the crime demanded a victim, and that as a result thereof the defendant was bound as a smoking sacrifice upon the altar of conjecture and suspicion. In my judgment, the case made against the defendant was far weaker than the *Montague case,* the *Goodson case,* the *Brackville case,* the *Lytle case,* or any other case in the books.

It is contended that the facts and circumstances are so slight in probative value that in themselves and standing alone they would not amount to evidence, but when taken in combination they constitute a rope of great strength. I do not concur in this reasoning. Unless the principles of mathematics have been recently changed, adding a column of zeros together produces zero; neither can a multitude of legal zeros beget a legal entity.