### STATE v. G. T. EUBANKS.

(Filed 8 April, 1936.)

**1. Criminal Law I j—**

Upon motion to nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom.

**2. Same—**

Upon motion to nonsuit, only the evidence favorable to the State will be considered.

**3. Same—**

The competency, admissibility, and sufficiency of evidence is for the court to determine, the weight, effect, and credibility is for the jury.

**4. Criminal Law L d—**

Where the charge of the court is not in the record, it will be presumed correct on appeal.

**5. Homicide H b—Evidence held sufficient to overrule nonsuit in this prosecution of constable for manslaughter.**

The evidence favorable to the State tended to show that deceased was attacked by a person with an axe handle, that deceased took the axe handle away from his assailant, and that thereupon his assailant called upon defendant, a constable, to arrest deceased for assault, that defendant went up and took hold of deceased, that deceased backed away across the highway and both shoulders of the road to his son's filling station, that several persons called to defendant not to shoot, but that defendant followed him, and then shot him four times, causing his death, that prior to the homicide defendant had made threats against deceased, and that after the shooting defendant cursed deceased. *Held:* The evidence was sufficient to be submitted to the jury on the question of defendant's guilt of manslaughter, either upon the theory that defendant shot the deceased for revenge, or used unnecessary and excessive force in attempting to arrest deceased.

**6. Arrest B a—**

> An officer of the law may use only reasonable and necessary force in making an arrest, and whether the force used in any particular case is reasonable and necessary or excessive and unnecessary is ordinarily a question for the jury.

APPEAL by defendant from *Cowper, Special Judge,* and a jury, at December Special Term, 1935, of JONES. No error.

The defendant was tried upon a bill of indictment charging him with murder in the first degree in connection with the killing of William Oxley. Upon the calling of the case for trial, the solicitor announced in open court that he would not ask for a verdict of murder in the first degree, but would ask for a verdict of murder in the second degree or manslaughter, as the court and jury might find the facts to be. Upon the conclusion of all the evidence, the solicitor announced that upon suggestion by the court he would not ask for more than manslaughter, and the case proceeded to argument with the defendant being tried for manslaughter in connection with the death of the said William Oxley. The defendant was convicted of manslaughter and sentenced to not less than four nor more than eight years in the State Prison.

Mrs. Ethel Oxley Quinn, a witness for the State, testified in part: "Mr. William Oxley, the deceased, was my father, and Mr. Dan Oxley is my brother. At the time my father was killed I was standing in the door of my brother's, Dan Oxley's, store. I was working there at the time. Some time before my father was killed I saw the defendant, Guy Eubanks, in Dan's store. It was about 3 or 3:30 o'clock in the afternoon. At that time my father was asleep in his room in the building. I heard a conversation between my brother Dan and defendant Eubanks. The reason why I think the defendant was drinking was because I had never seen him before but what he showed all manner of respect for everybody, and I judged by the way he talked in our station. The defendant went out of the store, was gone about 30 or 45 minutes, and then came back again, but I don't know where he went. From the statements and the way he acted and talked he was mad. He said he came there to settle the matter of corn. The second time he came back was about 4 or 4:15 o'clock, and he stayed only a few minutes. Dan was in the filling station and my father was still asleep. The next time I saw him after he left that time he was standing across the road at Mr. Lon Hawkins' filling station. . . . When papa came out he did not come to the store, and when I saw him I was standing in front of the store a few minutes before the shooting occurred. . . . He (deceased) started across the road where Mr. Dail was, and after he got over there I heard he and Mr. G. T. Eubanks, the defendant, in an argument. I could not understand what they were saying. They were across the

road from me, and was standing between Mr. Lon Hawkins' station and the log cabin. After they stood there and argued a while, papa came around in front of Mr. Hawkins' store, from the side where he had been, which is directly across the road from where I was. He and Mr. Eubanks seemed to have stopped. Then I saw Mr. Hawkins come out. I did not hear Mr. Hawkins tell papa to leave his premises, but I heard papa say he would leave, and then Mr. Hawkins went back in the store and got an axe handle and came out and hit papa with it. He tried to hit him on the head but papa threw his hands up and he hit him on the left arm two or three times. Then papa took the axe handle away from Mr. Hawkins and acted as if to hit Mr. Hawkins, and Mr. Hawkins went back in the store, and then Mr. Eubanks, the defendant, went up to papa. He went up and took hold of papa, but turned him loose, and papa started backing away towards Dan's station where I was, and still held the axe handle in his hand. I think he had the axe handle in his right hand and held it up and he kept backing back and Mr. Eubanks was following him. I did not see the pistol until they were at the center of the highway, and then I could see Mr. Eubanks had the pistol in his hand and papa still kept backing, and at that time I heard Mr. Will Dail holler and say, 'Guy, don't shoot!' Papa kept on backing until he got practically even with our gas tanks. He had backed all the way from Hawkins' station across the highway, which was about twice the width of the road, I think. He backed from one station clear to the other, which includes the highway and both shoulders to the road. Then it was that Guy Eubanks started to shooting. My father did not strike at him at any time, but he shot papa four times. Then papa walked in the store and lay down on the floor. . . . Four bullets took effect in my father's body and he is now dead. He was shot around 6 o'clock and died at 8:15 that same night in the Parrott's Hospital in Kinston. I asked Mr. Eubanks over a half-dozen times not to shoot papa. At that time papa was backing from the window of the highway to where he was shot. Papa was 60 years old, and he was not as large as Guy Eubanks, the defendant. I also heard Mr. Will Dail holler to him not to shoot papa a half-dozen times or more. . . . Papa knew Mr. Eubanks and had known him for a number of years and knew he was a constable, and I knew he was a constable."

Richard Casper testified, in part: "On the day of the shooting I was in Trenton. I saw Mr. Guy Eubanks about 2 o'clock that same day, and I heard him make a statement at that time. I heard Guy say that he would get even with Will Oxley, 'a d—— s. o. b., before night.' "

Wesley Smith testified, in part: "I live with Dan Oxley, and I help haul the corn away from the barn. Mr. Will Oxley went with us when we hauled the corn; it was hauled from George Metts' on the Guy

Eubanks' land. George Metts was farming for Guy Eubanks, and George Metts had an account with Mr. Oxley. Mr. Will Oxley hauled the corn, and I helped him, and this was done a week before the shooting."

Earl Smith testified, in part: "Mr. Eubanks was on the outside talking to somebody, don't know who. It was about dusk. Then Mr. Will Oxley went over to where Mr. Will Dail was. . . . Heard Guy Eubanks call Dan Oxley a 'd—— s. o. b.' and Mr. Will said, 'Don't you call my son a d—— s. o. b.,' and then Guy and Mr. Oxley got to arguing."

J. P. Taylor testified, in part: "From the way he (defendant) looked I judged he was drinking."

Will Dail testified, in part: "Eubanks shot Will Oxley four or five times. After he shot him Guy Eubanks said, 'G—— d—— you, I reckon you will stop now.' . . . I was about two-thirds the length of this building from Guy, and I hollered at Guy three or four times and said, 'Guy, I certainly would not shoot that man,' and my wife also hollered at him. . . . He did mention to me something about their having some trouble over the corn."

J. K. Dixon, who acted as coroner at the inquest, testified in part: "I think one ball looked like it went in a little bit to the left side, not right in front, left side of the abdomen. It came out over on the opposite side. There was another one that went in about the same side, but a little lower down, and came out lower down in practically the same position. Then there was one in the left leg, I think, and one in the arm, four different places. Two of them went through the body and through the intestines."

There was other evidence corroborating the State's evidence, and several witnesses testified that defendant was drinking.

The defendant gave a different version of what took place from that of the State—that the deceased was the aggressor and had had trouble with Hawkins, who ran the filling station, called the "Little Chicago," and who asked defendant as an officer to arrest the deceased for assault on him. Also that deceased had an axe handle which he had taken from Hawkins in an altercation, and defendant, at the request of Hawkins to arrest deceased for assault on him, had told deceased to consider himself under arrest; that the killing took place in an attempt to arrest deceased, and that deceased had a knife out. This was denied by the State's witnesses.

Defendant testified, in part: " 'I have asked you to drop the axe helve and consider yourself under arrest on good terms,' and just as I said that he hauled off and hit me a glancing lick on my arm and hit my head, and I ducked my head and almost fell down. Then when he hit me with the axe helve I shot under his feet, as I thought. At the time he drew

back again—the shooting did not take any effect at all—the first shot. Then he come back with another lick, glancing on my right side, and as I shot, his glancing lick hit my thumb of the hand I had the pistol in and the last report went off during the meantime; at the time he hit me the last time the glancing lick on my arm, then the pistol went off again. At the time I was doing my own aiming was under his feet, but the time he hit my hand with the axe helve I did not have any control with the gun as it went off the last two shots; the shots were in pretty rapid succession. I did not have any purpose other than to shoot him in the legs and make him quiet and drop his axe handle. . . . I was trying to protect myself and arrest him. I carry a pistol as an officer in performance of my duty. I think I shot four times."

In regard to previous troubles he had, he testified: (1) "It was kind of a race riot, you might say, trouble between white and colored boys, and I shot a Negro boy. The judge ruled it was done in self-defense. The Negro died. I was acquitted. I paid the funeral bill, but that was between the father of the dead boy and myself. I paid them $250.00, I and the father of the Negro boy settled that between ourselves." (2) "I also had a scrape with a fellow. The judge tried us and found us both guilty and spread the cost between us. That has been sixteen years ago." (3) "I cut John Gardner with a knife and he was sewed up by a doctor, but I don't know how many times I cut him. I don't know how many stitches the doctor took. He cut me, too. He was out in two or three days after I cut him." (4) "I had a little fuss with Wilbur Burnette at Polloksville. We had a little friendly fuss. He did not black my eyes, just scratched them a little, while he had me on the floor. That was while I was an officer. I don't say whether we were drinking or not, but I guess we had had a drink and got in a little fuss. . . . I don't think I was drinking the Saturday night before I killed Mr. Oxley, but I drank a bottle of beer in the pool room there. I had not taken anything besides beer more than usual that day. I don't usually get drunk every day, or pretty full. I was not drunk when I jumped on Mr. Larkins, just drinking a bottle of beer." (5) "On October 1st, I was indicted for driving an automobile while under the influence of whiskey; I was indicted, but I was not driving drunk. That case is on the docket but has not been proven." (6) "I also had a wreck with a colored fellow; he ran into me. I had drunk a bottle of beer and had eaten a sandwich. That case is still pending."

Defendant testified further: "I stopped there between 2 and 3 o'clock. I went in and just asked 'Dan Oxley what he wanted to do about it. He had my corn locked up and he had made threats that he was going to get it and I wanted to know what he wanted to do about it. I did not invite him out then; he invited me out. I had my pistol in my belt

then. I carried my gun when I left that morning. I had it when I left there at 4 o'clock; I had it all day. . . . I did take a drink with Rom McDaniels, a colored fellow, that day. I don't know who drank out of the bottle first. Another fellow had it. We all were drinking out of the same bottle. . . . I left him alone after I had fired four shots into his body. I told him plainly he had cursed me several times, and I told him not to hit me any more; I said, 'Don't you hit me any more; if you hit me any more I am going to shoot you;' he hit me again and I shot, and the next time he hit at me, he hit my arm and the next shots were not under my control. I shot four times."

The defendant introduced evidence corroborating his testimony as to what took place. He also introduced evidence that his general reputation was good. The jury returned a verdict of guilty of manslaughter. There was judgment on the verdict. The defendant made several exceptions and assignments of error, and appealed to the Supreme Court.

*Attorney-General Seawell and Assistant Attorney-General McMullan for the State.*

*J. A. Jones for defendant.*

CLARKSON, J. The defendant, at the close of the State's evidence and at the close of all the evidence, moved to dismiss the action or for judgment of nonsuit. C. S., 4643. The court below denied the motions. This constitutes defendant's sole exceptions and assignments of error. The only question involved in this appeal: Was there sufficient evidence of defendant's guilt to be submitted to the jury? We think so.

On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. "An exception to a motion to dismiss in a criminal action taken after the close of the State's evidence, and renewed by defendant after the introduction of his own evidence, does not confine the appeal to the State's evidence alone, and a conviction will be sustained under the second exception if there is any evidence on the whole record of the defendant's guilt." *S. v. Earp,* 196 N. C., 164 (166). See *S. v. Carlson,* 171 N. C., 818; *S. v. Sigmon,* 190 N. C., 684. The evidence favorable alone to the State is considered— defendant's evidence is discarded. *S. v. Utley,* 126 N. C., 997. The competency, admissibility, and sufficiency of evidence is for the court to determine, the weight, effect, and credibility is for the jury. *S. v. Utley, supra; S. v. Blackwelder,* 182 N. C., 899; *S. v. Lawrence,* 196 N. C., 562 (564).

The charge of the court below is not in the record, and the presumption is that the court below charged the law applicable to the facts.

The defendant was mad with the deceased because he hauled some corn from defendant's tenant's farm to pay a bill which the tenant owed to the Oxleys. About 2 o'clock of the day of the killing defendant told Richard Casper "that he would get even with Will Oxley, a d—— s. o. b., before night." He went to deceased's son's (Dan's) store about 3:30 o'clock that afternoon and came back about 4:15 o'clock. He said that he came there to settle the matter of corn. The deceased was sleeping at the time defendant came and when deceased awoke he went across the road to Hawkins' filling station. There was a quarrel between Hawkins and the deceased—the deceased took an axe handle away from Hawkins. The defendant went up and took hold of the deceased. The deceased, with the axe handle, kept backing across the road to his son's filling station, the defendant following him. He had backed from one station, across the highway and both shoulders of the road, until he got even with the gas tanks—then it was that defendant shot him four times, all the shots taking effect. The deceased was an old man and the defendant was comparatively a young man. The defendant was larger than the old man. The deceased did not strike at defendant at any time. Several witnesses hollered to defendant, in substance, "Guy, I certainly would not shoot that man." After defendant had shot the deceased, he said, "G—— d—— you, I reckon you will stop now."

In *S. v. Bland,* 97 N. C., 438 (443), speaking to the subject, it is said: "The law does not clothe an officer with the authority to judge arbitrarily of the necessity of killing a prisoner to secure him, or of killing a person to prevent a rescue of a prisoner. He cannot kill unless there is a necessity for it, and the jury must determine, from the testimony, the existence or absence of the necessity. They must judge of the reasonableness of the grounds upon which the officer acted."

In *S. v. Pugh,* 101 N. C., 737 (740), as to the rights of an officer to make an arrest, it is said: "A grossly unnecessary, excessive, and wanton exercise of force would be evidence—strong evidence—of a willful and malicious purpose, but the jury ought not to weigh the conduct of the officer as against him in 'gold scales'; the presumption is he acted in good faith. This is the rule applicable in such cases as the present one, as settled in *S. v. Stalcup,* 24 N. C., 50; *S. v. McNinch,* 90 N. C., 695, and the cases there cited. So, also, *S. v. Bland,* 97 N. C., 438." *S. v. Dunning,* 177 N. C., 559 (562-3); *Holloway v. Moser,* 193 N. C., 185; *S. v. Jenkins,* 195 N. C., 747.

In *S. v. Orr,* 175 N. C., 773 (775), we find: "If Grant, instead of acting as an officer of the law in arresting Birchfield, engaged in an

affray with him and afterwards assisted Orr in causing his death, he is at least guilty of manslaughter, of which he was convicted."

On this record it is presumed that the court below charged the jury on the law, as above stated, and applied the law applicable to the facts.

On two aspects the evidence was sufficient to be submitted to the jury: (1) The defendant was, in the language of the witness, "mad" at deceased and had made threats against him, and the defendant shot deceased for revenge. (2) If he was acting in good faith, as an officer, attempting to arrest deceased, it was for the jury to determine whether he used unnecessary and excessive force. Without any danger to himself, he shot deceased, while backing away from him, four times in the body, and at the time the evidence is that witnesses appealed to him not to shoot.

The defendant is a constable, and his first duty is to "preserve the public peace." It is in evidence that he was a frequent violator of the law, and there was at the time of the trial an indictment pending against him "for driving an automobile while under the influence of whiskey."

The defendant's counsel ably argued the case in this Court, and no doubt before the jury, but we think the court below correct in submitting the matter to the jury.

In the record we see

No error.